*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0254p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee,*

      *v.*

CUTERRIS GREEN,

> *Defendant-Appellant.*

No. 06-6186

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00153—Todd J. Campbell, Chief District Judge.

Argued: July 25, 2007

Decided and Filed: July 16, 2008

Before: KEITH and GRIFFIN, Circuit Judges; VAN TATENHOVE, District Judge.[*]

---

## COUNSEL

**ARGUED:** Caryll S. Alpert, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. David Rivera, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Caryll S. Alpert, Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. David Rivera, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

VAN TATENHOVE, D. J., delivered the opinion of the court, in which GRIFFIN, J., joined. KEITH, J. (pp. 17-20), delivered a separate dissenting opinion.

---

## OPINION

---

VAN TATENHOVE, District Judge. Cuterris Green, a pretrial detainee, objects to the involuntary administration of psychotropic drugs to render him competent to stand trial. We review the district court's consideration of whether the government's interest in prosecution outweighs Mr. Green's constitutional right to refuse intervention. *Sell v. United States*, 539 U.S. 166 (2003).

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Because we conclude that it does, we affirm the district court's decision and find that medications properly may be administered to restore Mr. Green's competency.[1]

## I.

Cuterris Green ("Green") was charged in a five-count indictment for the following drug-related activities: (1) possession with intent to distribute approximately 29.6 grams of marijuana in violation of 21 U.S.C. § 841(a)(1); (2) possession with intent to distribute approximately 1.8 grams of cocaine in violation of 21 U.S.C. § 841(a)(1); (3) possession with intent to distribute approximately 1.7 grams of cocaine in violation of 21 U.S.C. § 841(a)(1); (4) possession with intent to distribute approximately 1.6 grams of cocaine in violation of 21 U.S.C. § 841(a)(1); and (5) possession with intent to distribute approximately 50 grams of cocaine base, approximately 168 grams of cocaine, and approximately 140 grams of marijuana, all in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. In addition to the counts charged, the indictment also contained two Sentencing Allegations: *first*, that Green possessed with the intent to distribute between 150 and 500 grams of cocaine base, and *second*, that Green possessed a dangerous weapon during the commission of the offense.

The charges in the indictment arise from activity occurring between April 28, 2004 and May 7, 2004, during which time Green sold illegal drugs to an undercover law enforcement officer. After the final sale, law enforcement officials followed Green and conducted a traffic stop where they found a small amount of the drugs. Simultaneously, officials executed a search of Green's residence where they found a larger amount of crack cocaine and a loaded "Tech 9" semi-automatic firearm, along with several empty magazines in a bedroom drawer.

Green was arrested, and temporarily detained pending arraignment and a hearing on the government's motion for detention. The next day, Green was arraigned, followed by the detention hearing. The Magistrate Judge, noting Green's prior convictions, which included the assault of his mother, as well as the serious nature of the federal charges and potential penalties he faced, concluded that Green had not overcome the rebuttable presumption of detention and that he posed a "substantial risk of danger to the community." Accordingly, Green was detained pending trial.

As part of the pretrial proceedings,[2] Green moved for a determination of mental competency pursuant to 18 U.S.C. § 4241(a). The United States similarly moved, and the district court conducted a hearing at which it determined that Green may be suffering from a "mental defect rendering him mentally incompetent to the extent that he is unable to understand the nature and

---

[1] We have jurisdiction over Green's appeal pursuant to the "collateral order" doctrine. In *Sell*, the Supreme Court recognized that appellate review of interim orders such as the one from which Green appeals is proper under this doctrine because the order:

> (1) "conclusively determine[s] the disputed question," (2) "resolve[s] an important issue completely separate from the merits of the action," and (3) is "effectively unreviewable on appeal from a final judgment."

*Sell*, 539 U.S at 176 (citing *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)). Although the Court discussed the first two factors, it appears the Court's primary focus was on the last given the "severity of the intrusion" on the defendant's body. *See id.* at 177. It is true that once a criminal defendant has been forcibly medicated, any appellate review would be ineffective because the "very harm that he seeks to avoid" cannot be undone even if he is acquitted. *See id.* Accordingly, appellate review of the district court's non-final order is proper in this case.

[2] There are several portions of the Joint Appendix, including the district court memorandum opinion and order and many of the forensic reports at issue, which were filed under seal. To the extent these issues were either discussed during oral argument or raised by the parties in their briefs, all of which is now part of the public record, those matters are addressed openly in this opinion.

consequences of the proceedings against him or to assist properly in his defense." Pursuant to 18 U.S.C. §§4241 and 4247, and Federal Rule of Criminal Procedure 12.2(c), the district court ordered that Green be committed to the custody of the Attorney General for a determination of his mental competency, and that a report be filed outlining the result of the mental examination. Green was transferred to the Federal Medical Center in Lexington, Kentucky ("FMC Lexington"), where an April 13, 2005 Forensic Report concluded that he was incompetent to stand trial. Specifically, the evaluation concluded that Green suffered from Psychotic Disorder Not Otherwise Specified. In her written evaluation, Dr. Betsy Campbell concluded:

> Mr. Green **is** currently suffering from a mental disease or defect rendering him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense. Therefore, it is the opinion of the undersigned evaluator he is **not** currently competent to stand trial.

Although Green was not combative or otherwise disruptive during his evaluation, he denied any history of mental illness and refused to accept any treatment in spite of clear and indisputable evidence to the contrary.

For example, Green's mother advised the evaluators that he had suffered from mental illness for some time. In fact, his mental illness affected his ability to maintain stable employment and Green had received disability benefits for psychiatric problems. *Id.* The FMC Lexington possessed evidence that Green "hears voices," demonstrates "compulsive" behaviors, paranoia, delusions, and hallucinations. Likewise, the medical records from the Mental Health Co-Op confirmed these general factual observations and medical conclusions regarding Green's mental status. Accordingly, Drs. Campbell and Helvey recommended commitment to a BOP inpatient treatment facility. They advised that involuntary medication would likely be required to restore Green's competency "[b]ecause of his difficulty acknowledging his mental illness, accepting his need for treatment, and complying with treatment when offered."

Relying on the Forensic Report from FMC Lexington, both the government and counsel for the Defendant agreed that Green was incompetent. Consequently, and after conducting a hearing, the district court specifically determined the same, and held that Green was "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." Accordingly, the trial court committed Green to the custody of the Attorney General for a four-month period to determine whether he could attain the mental capacity to proceed to trial, and noted that, given Green's refusal to voluntarily medicate himself, any further requests regarding involuntary medical treatment should be made to the district court in writing.

At that point, Green was transferred to the Federal Medical Center in Rochester, New York ("FMC Rochester") for continued evaluation, appropriate treatment, and a medical determination regarding his ability to attain sufficient competency to stand trial. The FMC Rochester completed its evaluation and provided it to the district court on January 3, 2006. Green was even more uncooperative during his time at FMC Rochester than at FMC Lexington in that he refused to discuss his legal case, denied any history of mental illness, refused any medical treatment or to participate in any testing, and appeared generally confused and disoriented. Ultimately, those physicians also concluded that Green suffers from Psychotic Disorder Not Otherwise Specified (NOS) and Rule Out Malingering. In addition, the evaluation noted the existence of Green's non-insulin dependent Diabetes Mellitus. The examiners at FMC Rochester, including Dr. Andrew Simcox, reached competency conclusions similar to those reached by the physicians at FMC Lexington:

Mr. Green is currently suffering from a mental disease or defect rendering him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense. Furthermore, we believe there is a substantial probability he will attain the capacity to permit the trial to proceed in the forseeable future if he receives appropriate mental health care. It appears clear the administration of such care would need to be court ordered, as Mr. Green has consistently declined to consent to such treatment.

In addition to the above-outlined diagnosis, the FMC Rochester report considered the propriety of involuntary medication in light of the *Sell* factors. Ultimately, the examiners concluded that Green's quality of life would benefit greatly from involuntary medication beyond simply restoring his capacity to stand trial, particularly given his past positive response to similar treatment, and noted that any side effects from such treatment were unlikely to interfere with his defense. The report went on to note that his mental status would not likely improve absent the imposition of medication and that no less intrusive means available would achieve the same result. The United States then requested that the district court order involuntary medication to restore Green's mental competency to stand trial. Green opposed the motion, and both the government and Green filed memoranda in support of their respective positions. Ultimately, on August 18, 2006, the district court conducted a hearing at which it determined that Green should be involuntarily medicated to restore his competency.[3]

At the hearing, the district court heard extensive testimony on behalf of the government from two physicians from FMC Rochester, Dr. Andrew Simcox and Dr. Donna Christine Sigurdson. In addition, Dr. John Griffin, a private psychologist, provided testimony on behalf of Green. Both Drs. Simcox and Sigurdson testified that Green demonstrated paranoia and high levels of distrust, as well as continued refusal to acknowledge his mental health issues. Dr. Sigurdson provided detailed testimony regarding Green's mental health, both past and present, the proposed treatment plan for Green, the anticipated length of time required to restore him to competence, the virtues and hazards of first and second generation anti-psychotic medications generally, and the effects of such medications in light of Green's individualized mental health and general medical conditions, including diabetes.

Dr. Griffin testified on behalf of Green. During his testimony, Dr. Griffin agreed with the proposed treatment plan offered by the government and their medical conclusions regarding Green's competency and potential improvement with involuntary medication. He testified that the preferred method, in his view, would be therapeutic, but did not seriously dispute the conclusions reached by the government's experts, and likewise indicated that his private practice experience made him unfamiliar with the prison context at issue here. Much of Dr. Griffin's testimony centered on "wellness"' rather than competence to stand trial. In addition to the live testimony, the district court received a substantial amount of written evidence, including the various FMC evaluations of Green, which included information provided by his family, his prior medical records from the mental health cooperative, and other relevant information provided by Green himself during the evaluation process.

On August 24, 2006, the district court entered an order requiring the defendant be involuntarily medicated and filed a separate memorandum in support. The Sealed Memorandum detailed the court's reasoning as it related to a finding for each *Sell* factor, and then, by separate Sealed Order, recited verbatim from its Sealed Memorandum the following directive:

---

[3]We note that the due process hearing required by 28 C.F.R. § 549.43 was conducted in advance of the district court hearing. Neither party raises any procedural concerns in this appeal related to failure to exhaust any required administrative processes. *See United States v. White*, 431 F.3d 431 (5th Cir. 2005) (holding that due process requires exhaustion of administrative procedures under 28 C.F.R. § 549.43 before conducing *Sell* inquiry)

Having determined that the Government has satisfied the <u>Sell</u> factors for involuntary medication of the Defendant to restore him to competence, the Court continues Defendant's commitment pursuant to 18 U.S.C. §4241(d)(2)(A). The Bureau of Prisons' mental health professionals are authorized to involuntarily medicate the Defendant, consistent with the prevaling standard of care for mental health professionals, to restore the Defendant to competence. The commitment shall continue for four months, or a lesser period if reasonably sufficient to restore him to competency. At the end of four months, or when the Defendant's competency is restored if that occurs in less than four months, the Bureau of Prisons shall file a report with the Court describing the results of the treatment.

It is from that Sealed Order, and the reasoning underlying it as expressed in the accompanying Sealed Memorandum, that Green brings this interlocutory appeal pursuant to *Sell v. United States*, 539 U.S. 166 (2003).

## II.

## A.

In *Sell v. United States*, 539 U.S. 166 (2003), the United States Supreme Court considered long-standing precedent[4] regarding a defendant's constitutional right to refuse medical treatment. It held that, in certain circumstances, "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial." *Id*. at 179-180.

From that standard, the Court articulated a four-part analysis to be conducted by the district court when determining whether involuntary medication may be utilized to render a defendant competent to stand trial where he does not pose a danger to himself or the community.[5] A *Sell* order requires the government to present clear and convincing evidence of the following: (1) the existence of an "important" governmental interest; (2) that involuntary medication will "significantly further" the government interest; (3) that involuntary medication is "necessary" to further those interests; and (4) that the administration of the drugs must be "medically appropriate" for the individual defendant.[6] *Id*. at 180-181. Green contends that the district court erred as to factors one, two, and

---

[4] The *Sell* Court considered the framework set forth by its predecessors in *Washington v. Harper*, 494 U.S. 210 (1990) and *Riggins v. Nevada*, 504 U.S. 127 (1992). *Sell*, 539 U.S. at 175-178. In *Harper*, the Court recognized that an individual "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Harper*, 494 U.S. at 221-222 (citations omitted). The *Harper* court noted, however, that the involuntary medication of an inmate would not violate due process if the inmate were "dangerous to himself or others and the treatment is in the inmate's medical interest." *Id*. at 227. Likewise, in *Riggins*, the Supreme Court found that forced medication would not violate due process if the government showed that such medication was essential for the defendant's "own safety or the safety of others." *Riggins*, 504 U.S. at 135. Further, the *Riggins* Court noted that forced medication may have been appropriate had the government shown that it could not have conducted a fair trial absent any less intrusive means. *See id*. In light of these two cases, the *Sell* court concluded that, in certain circumstances, the government's interest in prosecution could outweigh a defendant's constitutional right to be free of unwanted medical treatment. *Sell*, 539 U.S. at 175-179.

[5] The *Sell* standard applies when the forced medication is requested to restore competency to a pretrial detainee and the pretrial detainee is not a danger to himself or others. When the pretrial detainee is a potential danger to himself or others, the *Harper* standard is used. *See Sell*, 539 U.S. at 185.

[6] Here, the parties have agreed that the *Sell* standard applied to the district court's determination and that the government bore the burden of proof by clear and convincing evidence. Because of this, the government was not required to explain why it was not seeking involuntary medication on *Harper*-type grounds, nor was the district court required to make such a finding in excess of stating why it applied the *Sell* standard, which it did in this case. *See Sell*,

four, and provides the first opportunity this Circuit has had to consider the application of the *Sell* factors.

**B.**

Green first argues that the district court erred when it determined that his crimes were sufficiently "serious" to support an important governmental interest in prosecuting him. Our review is guided by well-established principles in the Sixth Circuit. Generally, a *de novo* standard applies to legal conclusions and findings of fact are reviewed for clear error. *See e.g., United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). Although this Circuit has not specifically addressed the nature of the *Sell* factors, our sister circuits have done so and determined that the first factor, the existence of an "important" government interest, is a legal conclusion which requires a *de novo* review. We agree. *See e.g., United States v. Hernandez-Vasquez,* 513 F.3d 908, 915-916 (9th Cir. 2008) ("We...review the district court's determination with regard to the first *Sell* factor *de novo* and the remaining *Sell* factors for clear error.") (citation omitted); *United States v. Evans*, 404 F.3d 227, 236 (4th Cir. 2005) ("The district court's determination that the government's interest is 'important' is a legal conclusion that we review de novo.") (citation omitted); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004) ("Whether the Government's asserted interest is important is a legal question that is subject to *de novo* review."); *United States v. Bradley*, 417 F.3d 1107, 1113-1114 (10th Cir. 2005) (finding that, as to factors one and two, the balance between government's interest and defendant's is a mixed question of law and fact that nonetheless requires *de novo* review). We therefore hold that the question of whether an important governmental interest is at stake is a legal question which requires *de novo* review.

Green makes two basic points. First, he contends the district court should not have applied the Fourth Circuit's "potential penalty" rule in determining whether the crime was "serious" because Green's penalties were arbitrarily enhanced by the presence of crack cocaine even though his charges were non-violent. Second, Green believes that the crimes with which he is charged are not serious crimes against "persons" or "property" as required by *Sell*. He believes that the crimes for which he is charged are nonviolent, "victimless" street-level drug trafficking offenses. Absent the existence of "crack cocaine," Green argues, the penalty would have been less severe than the statutory ten year mandatory minimum he currently faces. Notably, the existence of a firearm in his home during the commission of a drug offense operates as a sentencing enhancement under the United States Sentencing Guidelines, which makes Green's potential sentence between 210 and 262 months (17.5 years to 21.8 years).[7] Although Green acknowledges the enhancement, it's a fact that he contends should not be relevant to the "serious" nature of the crime committed. Because we ultimately conclude the Sentencing Guidelines are not an entirely objective measure of the seriousness of a crime, but rather look to the maximum statutory penalty, this point is not dispositive of the current question.[8]

---

539 U.S. at 181-183. Further, in his initial brief, Green cited *United States v. Brandon*, 158 F.3d 947, 957 (6th Cir. 1998) which adopted a strict scrutiny standard when considering whether a defendant should be involuntarily medicated to restore his competence to stand trial. Because *Brandon* was decided five years earlier than *Sell v. United States*, and the parties have stipulated to the *Sell* standard, this Court finds *Brandon* inapplicable to the instant case given subsequent Supreme Court precedent.

[7] U.S.S.G. § 2D1.1(b)(1) provides for a two-point increase in a defendant's offense level if a firearm is "possessed" during a drug-trafficking crime. *See e.g., United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir.1996) (articulating four-part test to determine whether sentencing enhancement is proper); *United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002) (finding proper application of firearm enhancement).

[8] Subsequent to the briefing in this appeal, the United States Sentencing Commission amended the United States Sentencing Guidelines for certain categories of offenses involving crack cocaine. *See* U.S.S.G. § 1B1.10 (also noted in Amendment 706, Appendix C, U.S.S.G. Manual). Specifically, the amendment effectively lowers the Guideline range

In the instant case, the district court correctly found that the government had an "important" interest in prosecuting Green for the crimes charged after careful consideration of the exact arguments he makes as part of the instant appeal. As we do here, it rejected Green's argument that his crimes were not "serious" simply because they did not involve "large-scale drug trafficking:"

> Given the potential sentence faced by the Defendant, the Court concludes that the Government has an important interest in bringing the Defendant to trial. Despite Defendant's argument that "street level drug deals" do not qualify as "serious," the substantial sentences attached to the charged offenses reflects a policy decision by Congress that the crimes are serious ones.

The district court noted that other circuits had considered both the potential statutory penalty and the potential Guideline range in determining whether a crime was sufficiently "serious" to meet the first prong of the *Sell* standard. *See e.g.*, *United States v. Evans*, 404 F.3d 227 (4th Cir. 2005) (holding that maximum statutory penalty of ten years warrants finding of serious to support *Sell* order). We agree. Therefore, this legal determination was not error.

In *Sell*, the Supreme Court did not delineate exactly those crimes which should be considered "serious" or even outline the considerations a court should take into account when making that determination. Rather, it simply said,

> a court must find that *important* governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property. In both instances the Government seeks to protect through application of the criminal law the basic human need for security.

*Sell*, 539 U.S. at 180 ("'[P]ower to bring an accused to trial is fundamental to a scheme of "ordered liberty" and prerequisite to social justice and peace'") (citing *Riggins v. Nevada*, 504 U.S. 127, 135-136 (1992) quoting *Illinois v. Allen*, 397 U.S. 337, 347 (1970)). Without more specific guidance or a rigid test, courts are left to fashion appropriate, and presumably objective parameters by which to assess seriousness. Other courts considering whether a crime meets the seriousness requirement have looked, as the district court did in this case, to the potential statutory penalty and/or Guideline range of imprisonment which may be imposed. *See e.g.*, *United States v. Evans*, 404 F.3d 227 (4th Cir. 2005) (holding that maximum statutory penalty of ten years warrants finding of serious to support *Sell* order); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004) (noting the defendant faced a mandatory statutory minimum of 15 years imprisonment because of his prior drug convictions evidenced congressional view that crime was "serious"); *United States v. McCray*, 474 F.Supp.2d 671, 677 (D.N.J. 2007) (relying on statutory maximum sentences to determine whether crime was "serious" for purposes of *Sell* order).

---

by reducing the base offense level by approximately two points for the quantities of crack cocaine outlined in the Drug Quantity Table contained in U.S.S.G. § 2D1.1. Although the effective date of the amendment was March 3, 2008, it will have retroactive effect for certain, eligible defendants who were sentenced on or after November 1, 2007. *See id*; 18 U.S.C. §§ 994(u), 3582(c)(2). Although neither Green or the government raises this issue, nor does it alter our holding, we feel it must be addressed given the arguments made by Green. First, because of our conclusion that district courts must look to the statutory penalty set forth by Congress to determine whether a crime is "serious" for purposes of a *Sell* analysis, any changes in the potential Guideline ranges are irrelevant. Second, the potential applicability of the reduction and retroactive effect continues to depend on subjective factors (e.g., nature and characteristics of the particular defendant and his or her crime) and specifically cannot override any mandatory statutory minimum sentences set forth by Congress. These caveats only underscore our holding that the statutory penalty is the more appropriate, and most objective measure by which to determine the seriousness of a particular crime.

In *United States v. Evans*, the Fourth Circuit determined that "it is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes." *United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005). Underlying this rationale is both a recognition of and respect for the fundamental role of the legislative process in making these seriousness determinations, as well as an effort to find some objective standard by which to analyze the first *Sell* factor. *See id.* Such an approach avoids an arbitrary determination of seriousness that could befall appellate courts given the breadth of potential criminal charges, the prevailing attitudes of a particular community as it relates to a specific crime, the particularities of any given case, as well as any number of other subjective factors that could influence this determination, and ultimately, lead to unavoidable disparity among the circuits regarding what constitutes a "serious" crime. As recognized by the Fourth Circuit, the United States Supreme Court cautions the judiciary against just such an intrusion into the legislative process:

> In recent years, however, we have sought more "objective indications of the seriousness with which society regards the offense. [W]e have found the most relevant such criteria in the severity of the maximum authorized penalty." In fixing the maximum penalty for a crime, a legislature "include[s] within the definition of the crime itself a judgment about the seriousness of the offense." The judiciary should not substitute its judgment as to seriousness for that of a legislature, which is "far better equipped to perform the task, and [is] likewise more responsive to changes in attitude and more amenable to the recognition and correction of their misperceptions in this respect."

*Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-542 (1989) (citations omitted).

Here, Green argues that the statutory penalty imposed for possession of crack cocaine was not an accurate measure of the seriousness of his crime because he possessed only a small amount of the drug, the crime is non-violent[9], and that the crime is "victimless" because the Sentencing Guidelines designate it as such. We disagree.

First, we simply cannot conclude that only "violent" crimes are "serious" for purposes of this analysis. There are any number of criminal behaviors that do not involve crimes of violence that are "serious" matters. Indeed, the *Sell* court noted that fraud was a serious crime. *See Sell*, 539 U.S. at 180; *see also United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226-1227 (10th Cir. 2007) (finding illegal entry charge a "'serious crime' despite there being no indication that the conduct for which he was charged was violent or harmful to others" for purposes of *Sell* analysis). Hence, violence alone does not define a "serious" crime.

Second, we do not subscribe to the theory that the legislative branch considers drug-trafficking crimes as "victimless," regardless of the scale of the operation. If a criminal defendant possesses an illegal substance with the intent to distribute that substance to others, unquestionably there are victims. The lack of an identifiable person in this case does not equate to a completely "victimless" crime. Fortunately, Green sold the drugs in question to a confidential informant who had no intention of disseminating the drugs into the larger community. Had the buyer been an actual dealer or user, however, it is doubtful that he would make this same argument. Certainly, it would have even less credence than it has now. Society as a whole is the victim when illegal drugs are being distributed in its communities. It follows that Green's family is a victim because of his illicit activities. And, perhaps most importantly, Congress' imposition of such harsh penalties for these drug-related crimes underscores our view.

---

[9]Notably, Green's argument omits the fact that he faces a sentencing enhancement for possession of a firearm during the drug offense, although it was not "charged" in the indictment.

Third, the maximum statutory penalty is the most objective means of determining the seriousness of a crime and the standard we adopt. In this case, the mandatory statutory *minimum* is sufficient. If Green were convicted of possession with intent to distribute, he faces a statutory *minimum* sentence of ten years imprisonment under 21 U.S.C. § 841(b)(1)(A). The maximum which could be imposed is life imprisonment. *See id.* Unquestionably, these penalties represent a decision by the legislature that possession of crack cocaine with the intent to distribute is a "serious" crime warranting a serious punishment. By utilizing the potential statutory penalty to assess the seriousness of a crime, we employ an objective standard for application and thereby avoid any arbitrary determinations, and further, respect the judgment of the legislative branch as reflective of societal attitudes.

Moreover, the Supreme Court has spoken on this very point in other jurisprudence. Whether a crime is "serious" should be determined by its maximum statutory penalty. *See e.g.*, *Lewis v. United States,* 518 U.S. 322, 326 (1996) ("Now, to determine whether an offense is petty, we consider the maximum penalty attached to the offense. This criterion is considered the most relevant with which to assess the character of an offense, because it reveals the legislature's judgment about the offense's severity. 'The judiciary should not substitute its judgment as to seriousness for that of a legislature, which is far better equipped to perform the task.' In evaluating the seriousness of the offense, we place primary emphasis on the maximum prison term authorized. While penalties such as probation or a fine may infringe on a defendant's freedom, the deprivation of liberty imposed by imprisonment makes that penalty the best indicator of whether the legislature considered an offense to be 'petty' or 'serious.'") (citations omitted); *see also Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-542 (1989) ("'[W]e have found the most relevant such criteria in the severity of the maximum authorized penalty.' In fixing the maximum penalty for a crime, a legislature 'include[s] within the definition of the crime itself a judgment about the seriousness of the offense.'") (citations omitted).

Further, we need not decide whether consideration of the potential Guideline range leads to the same result. First, the Sentencing Guidelines are now advisory and a district court is not required to impose a particular sentence in accordance with the projected range. *See United States v. Booker and United States v. Fanfan*, 543 U.S. 220, 245-246 (2005) ("So modified, the federal sentencing statute, see Sentencing Reform Act of 1984, (Sentencing Act), as amended, makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C.A. § 3553(a)(4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well.) (citations omitted). Second, the Guideline ranges reflect the views of the Sentencing Commission rather than Congress as a duly elected body of the people. *See* U.S.S.G. § 1A1.1 ("The guidelines, policy statements, and commentary set forth in this Guidelines Manual, including amendments thereto, are promulgated by the United States Sentencing Commission."). Finally, it would be impossible for a district court to adequately utilize the Guideline range in making an objective decision as to the seriousness of a particular crime. Most often, the Guideline range is not determined finally until after a defendant has been convicted and a presentence investigation report has been completed. *See* Fed. R. Crim. P. 32(c). As part of that process, many variables impact a potential range. For example, previous criminal history points may or may not be assigned depending on how such crimes are categorized and punished in different states, as well as various enhancements and reductions depending on the particular circumstances of an individual defendant's case, to name a few. None of this information would be available to a district court at the time it must make the seriousness determination on an involuntary medication request. While Guideline estimates may be provided in advance of the presentence investigation report, those are merely estimates, and are based solely on the limited information available at a very early stage of a criminal proceeding and are subject to change as additional information becomes available. All of these considerations weigh against relying on the Sentencing Guidelines to determine whether a crime is "serious" for purposes of a *Sell* order, and counsel in favor of using the statutory maximum prescribed by Congress.

We do not read *Sell* to impose a requirement that the crime at issue be against "person" or "property" to be "serious," as Green suggests. In support, Green relies on *United States v. Barajas-Tores*, No. CRIM EP-03-CR-2011KC, 2004 WL 1598914, *1 (W.D. Tex. July 1, 2004), where the district court held that a charge of illegal reentry into the United States was not "serious" for purposes of the *Sell* standard because it did not involve a crime against person or property. *See id.* at *3. Other circuits have disagreed with the district court in Texas. For example, in *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226-1227 (10th Cir. 2007), the Tenth Circuit Court of Appeals held that an illegal entry charge was a "'serious crime'" for purposes of the *Sell* analysis, "despite there being no indication that the conduct for which he was charged was violent or harmful to others." *Id.* Likewise, we conclude that a district court may rely on the potential statutory penalty to determine whether the crime meets the "serious" requirement to justify the important governmental interest in prosecuting a particular defendant, regardless of whether the crime is against persons or property, or neither. While the nature of the crime committed and the potential Sentencing Guideline range may bear on the district court's assessment, those factors alone are not dispositive in and of themselves. Rather, we believe that the prescribed statutory penalty provides the most objective view of seriousness because it necessarily takes into account such factors as the nature of the crime, as well as the defendant's characteristics (e.g., subsequent or second offender penalities).

In identifying the nature of the government's interest in involuntary medication, the *Sell* court found that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property." *Sell*, 539 U.S. at 180. The *Evans* court interpreted this statement to merely reference the charges with which Sell himself was charged rather than as a specific requirement regarding the nature of the crime in every instance. *Evans*, 404 F.3d at 227, fn 6. We agree. Had the *Sell* Court intended Green's suggested result, it could have easily made this point as it did with respect to the specificity it required of the district courts in the findings which must be made under the other factors. *See id.* at 181-182.

Rather, the reference more readily appears to be descriptive of the government's interest as it relates to the charges in that particular case. Charles Sell was charged with fraud and intimidation of a witness. The former is a crime against property and the latter a crime against the person. What the Court did say is that the government has an interest in prosecuting serious crimes and that crimes against persons or property could be serious enough to warrant the government's interest in prosecution. Just as we are unpersuaded by Green's argument that only violent crimes with victims are serious, we are equally unpersuaded that only crimes against persons or property are serious. Accordingly, we hold that the district court correctly found that the United States met its burden as to factor one of the *Sell* test in establishing a sufficiently important government interest in light of the "serious" crime charged against Green.

Finally, having found that the government has an "important" governmental interest at stake in prosecuting Green, we note that are no special circumstances which "lessen the importance of that interest" such as a "lengthy confinement in an institution for the mentally ill-and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime" or "the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b))." *Sell*, 539 U.S. at 180. As the district court correctly noted, Green does not argue that such circumstances exist, and neither expert indicated that Green would be a candidate for civil commitment. *See also United States v. Gomes*, 387 F.3d 157, 161 (2d Cir. 2004) (noting that lack of evidence that defendant would qualify for civil commitment weighs in favor of government's interest). In addition, if convicted, Green, having only been confined for three years, would still have the majority of a ten year mandatory minimum sentence to serve, at the least. Accordingly,

the government's important interest in prosecuting Green is not lessened by any special circumstances.

## C.

Green also challenges the district court's conclusions on the second and fourth *Sell* factors,[10] namely whether the district court correctly concluded that involuntary medication would significantly further the government's interest and whether it is medically appropriate for Green. These remaining considerations consist of factual findings; therefore the district court's conclusions as to those will be reviewed for clear error. *See also United States v. Hernandez-Vasquez,* 513 F.3d 908, 915-916 (9th Cir. 2008) ("We...review the district court's determination with regard to the first *Sell* factor *de novo* and the remaining *Sell* factors for clear error.") (citation omitted); *United States v. Evans*, 404 F.3d 227, 236 (4th Cir. 2005) ("The district court's determination that the government's interest is 'important' is a legal conclusion that we review de novo, although we review any factual findings relevant to this legal determination for clear error.") (citations omitted); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004) (finding that district court determinations as to *Sell* factors two, three, and four were factual and thus subject to review for clear error). In our Circuit, a factual finding is clearly erroneous only when "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006) (citing *Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir.1985)).

Specifically, Green contends that the district court's Sealed Order effectively issued a "blank check" to the government to medicate Green by failing to require a specific treatment plan with specific medications, amounts of medication, and an appropriately specific consideration of the potential side effects on Green given his history of diabetes. It appears Green's argument in this regard goes most appropriately to his challenge of the district court's finding as to the fourth factor, but because Green specifically questions the finding as to factor two, we address it as well.

Having determined that involuntary medication will significantly further an important government interest, the district court must find that "administration of the drugs is substantially likely to render the defendant competent to stand trial" and that "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181 (citations omitted). In reviewing the district court's factual findings on this second factor, we conclude there was no clear error.

In reaching its conclusion that the second factor had been satisfied by the government by clear and convincing evidence, the district court relied upon the following:

> The Government's experts both testified that the proposed medications were substantially likely to render the Defendant competent to stand trial. The statistical data cited in their opinions found improvement in a range of approximately 76% to 93% of those treated. Dr. Sigurdson described the history of mental health treatment received by the Defendant, as set forth in the available records, and opined that the

---

[10]The *Sell* Court set forth the third factor as requiring the court to "conclude that involuntary medication is necessary to further those interests." *Sell*, 539 U.S. at 181. In this vein, there must be a finding that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results" and "the court must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Id*. (citations omitted). Here, because Green does not challenge the district court's finding that the government proved this element by clear and convincing evidence, the Court need not address it.

Defendant would likely respond well to medication as he has responded well to treatment in the past.

Dr. Griffin did not dispute that the proposed medications would likely restore the Defendant to competence. Dr. Griffin cited lower statistics in discussing the Defendant's likely response to medication, but explained that the statistics he quoted related to restoring an individual to "wellness" rather than competency.

As to side effects, Dr. Sigurdson testified as to the likely side effects of the types of medications she would likely prescribe, and described the treatment she would prescribe to alleviate those side effects. Nothing in the testimony of the experts suggests that the likely side effects would interfere significantly with the Defendant's ability to assist counsel. Thus, the Court finds that involuntary treatment is substantially likely to render the Defendant competent, and is substantially unlikely to have side effects that will interfere significantly with his ability to assist counsel.

The hearing testimony of the witnesses confirm that the district court correctly assessed that involuntary medication was substantially likely to render Green competent to stand trial, and that such medication likely would not have side effects that would interfere with Green's ability to assist his counsel. To the contrary, without medication, Green appeared to distrust his counsel and refused to talk to her or meet with her at times during his evaluations and confinement. At one point, Green denied having ever met with an attorney. The medical records suggest that Green's quality of life and communications with others improved drastically while taking anti-psychotic medications. Thus, the medication presumably will only improve Green's relationship with his counsel, and his ability to participate effectively in this trial. Dr. Sigurdson testified that medication was more than ninety percent likely to restore Green's competency. Such an undisputed high probability of success certainly meets the "substantial likelihood" requirement mandated by *Sell* and any minimum standard recognized as appropriate by our sister circuits. *See e.g.*, *United States v. Gomes*, 387 F.3d 157, 161-162 (2d Cir. 2004) (noting that seventy percent chance defendant will be restored to competency is "substantial likelihood"); *United States v. Ghane*, 392 F.3d 317, 319-320 (8th Cir. 2004) (ten percent insufficient to meet substantial likelihood of restored competence).

Dr. Griffin, Green's expert witness, did not dispute these findings, but rather focused on achieving complete "wellness" rather than trial competence through varying treatments. Even if Dr. Griffin is correct, the question of competence is the one before this Court. He agreed that the proposed treatment plans likely would restore Green's competency, although he cited lower statistics regarding the potential response rate as between 25-75 percent. That is a potential response rate, and did not address Green specifically. Further, he did not dispute that Green's relationship with his counsel would improve, nor did he dispute that receiving these medications would improve his abilities to participate substantively in his defense at trial.

Finally, and contrary to the impression left by the dissent, the record reveals specific consideration of the side effects of anti-psychotic medications on Green generally and their potential impact on his diabetes. Dr. Sigurdson testified specifically about the impact of first and second generation drugs on the development of diabetes, and then specifically addressed the impact of antipsychotic medications on individuals, like Green, who already have diabetes. She noted that the primary side effect for Green would be potential weight gain, a matter that would need to be monitored, and which he had experienced previously when taking Zyprexa voluntarily. On these facts, we are not "left with the definite and firm conviction that a mistake has been committed" by the district court as to this factor. *See Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006) (citing *Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985)).

**D.**

Green also challenges the district court's conclusion that the proposed course of treatment was medically appropriate for him. Green raises this challenge based on his assertion that *Sell* requires a more particularized order than the one entered by the district court here. Specifically, the district court held that the Bureau of Prisons was authorized to involuntarily medicate Green "consistent with the prevailing standard of care for mental health professionals" for a period of four months or less if competency was restored, at which point a status report must be filed. Although the district court heard testimony, and obviously considered the alternative treatment plans offered by Dr. Sigurdson and Dr. Griffin, the Sealed Order did not make any reference to the specific medications, dosages, or length of treatment. In its Sealed Memorandum accompanying the Sealed Order, however, the district court generally outlined its reasoning for adopting the course of treatment proposed by Dr. Sigurdson at the hearing, although it did not provide a verbatim recitation of that treatment plan in either the Sealed Order or Memorandum. Although the dissent suggests otherwise, we do not dispute the general principle that a district court speaks through its "orders." To be sure, our holding rests not just on the Sealed Order, but also the reasoning and analysis outlined in the district court's accompanying Sealed Memorandum.[11] To hold otherwise would elevate form over substance in determining the appropriateness of the directive issued here.

Green's challenge surrounds Dr. Sigurdson's testimony regarding alternative treatment plans with different medications, neither of which could she commit to until she had the opportunity to determine whether, after the district court's ruling, Green would agree to take the medication in a pill form or require intravenous injection. He asserts that, by allowing the involuntary medication "consistent with the prevailing standard of care for mental health professionals" the district court violated certain progeny, and specifically *United States v. Evans*, 404 F.3d 227 (4th Cir. 2005) and *United States v. Hernandez-Vasquez*, 513 F.3d 908 (9th Cir. 2008),[12] by issuing a "blank check" for "carte-blanche" medical treatment.

Pursuant to the dictates of *Sell*, the district court must have concluded that "administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Sell*, 539 U.S. 166, 182 (2003).

In *Evans*, the Fourth Circuit found that the lower court erred in ordering involuntary medication where the report failed to identify the medication which would be given the defendant, or any proposed course of treatment as it related to the defendant as an individual and his "*particular* mental and physical condition." *Evans*, 404 F.3d at 241. There, the government simply discussed

---

[11]The dissent challenges the lack of specificity contained in the Sealed Order, but asks the majority to ignore the accompanying memorandum which contains the rationale the dissent seeks, because the district court chose to create two separate documents. We cannot subscribe to a theory of appellate review which ignores the document containing the very rationale we are asked to require. This is not to say that an order similar to the one at issue here, standing alone, would pass muster under *Sell*, but in this case, the district court's findings are sufficient. The Sealed Memorandum sufficiently addresses the issues presented and the separate Sealed Order arguably was unnecessary. In Section IV of its Sealed Memorandum, the district court states the verbatim language contained in the "Sealed Order" and then states "It is so ORDERED." The Sealed Order contains no information or language not already present in the Sealed Memorandum, and this is not a situation where the court's failure to act is in some way construed as a pronouncement. *See Bell v. Thompson*, 545 U.S. 794, 804 (2005).

[12]Green submitted this supplemental authority after the briefing and oral argument had been completed in this case.

anti-psychotic drugs and their benefits and burdens in a *general* manner that in no way considered the *particularized* medical needs of the defendant in question. For example, the report did not address the potential side effects of a medication on Mr. Evans, an elderly man with diabetes, hypertension, and asthma, or its interaction with other medications to treat those ailments. The report did not identify the specific medication to be used much less a dosage range. *See id.* at 241-242. Accordingly, the *Evans* Court required more from the government, and appropriately so.

The Fourth Circuit requires the government to "show that its proposed treatment plan is 'medically appropriate'" by explaining "why it proposed the particular course of treatment, provide the estimated time the proposed treatment plan will take to restore the defendant's competence and the criteria it will apply when deciding when to discontinue the treatment, describe the plan's probable benefits and side effect risks for the defendant's particular medical condition, show how it will deal with the plan's probable side effects, and explain why, in its view, the benefits of the treatment plan outweigh the costs of its side effects." *See id.* (citations omitted).

Likewise, in *Hernandez-Vasquez*, the Ninth Circuit held that an order which provides only that the "method of treatment and type of medication to be used shall be at the discretion of the treating medical professionals within the Bureau of Prisons" and expecting the government and the defendant to pursue "an agreed-upon course of treatment" did not meet the requirements of *Sell*. *See Hernandez-Vasquez*, 513 F.3d at 917. The lower court there allowed the physician to start with a "second-generation" medication, determine whether there was improvement, and then determine whether a different type of medication would be appropriate. *See id.* Such a broad delegation of authority leaves the Bureau of Prisons with unfettered discretion in treating a defendant, and such discretion renders the judicial inquiry merely "academic." *See id.* at 916. Accordingly, the appellate court held that the minium requirements for a *Sell* order are as follows:

> (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress. *We stress that while the court may not simply delegate unrestricted authority to physicians, the restrictions it does impose should be broad enough to give physicians a reasonable degree of flexibility in responding to changes in the defendant's condition.* Moreover, the Government or the defendant may move to alter the court's order as the circumstances change and more becomes known about the defendant's response to the medication.

*Id. at 916*-917 (9th Cir. 2008) (emphasis added).[13]

Both the Fourth and Ninth Circuits set forth parameters to ensure the government meets its burden under the fourth *Sell* factor. These cases are distinguishable from the record before us where the government clearly met its burden, and in fact, would have done so under the parameters set forth by our sister circuits, but the district court failed to include the specific treatment plan before it in its written order. Its reasoning, however, demonstrates that the district court here clearly

---

[13]The Ninth Circuit issued its original decision on October 31, 2007, however the government moved for re-hearing. Although the appellate court denied the government's motion, it amended the cited paragraph as part of its order and issued a superseding opinion. The italicized portion denotes the amendment. The previous paragraph contained the following language instead: "By setting such parameters within which physicians must operate, district courts will leave physicians enough discretion to act quickly to respond to changes in the defendant's condition." *United States v. Hernandez-Vasquez*, 506 F.3d 811, 819 (9th Cir. 2007) *amended and superseded by* 513 F.3d 908, 916-17 (9th Cir. 2008).

considered the treatment plans offered both by the United States and Green, and determined that involuntary medication was appropriate in this case in accordance with the plan set out by Dr. Sigurdson.

For example, in its accompanying Sealed Memorandum, the district court noted the following relevant testimony and evidence:

> Dr. Sigurdson testified at length about the possible medications to treat psychotic disorders, described the medications she would likely prescribe for the Defendant after consultation with her colleagues, and explained the reasons for her conclusions. She testified that the proposed course of treatment would be in the Defendant's best interests by improving his quality of life beyond restoration of competency. She testified that given the Defendant's present condition, it is unlikely that he would even be able to live on his own outside the prison setting. Without medication, Drs. Simcox and Sigurdson both testified, Defendant's condition is likely to worsen. Other than placing a greater emphasis on attempting to persuade the Defendant to take medications through therapy, Dr. Griffin did not seriously dispute Dr. Sigurdson's testimony and conceded that he did not practice in the prison setting.

Again, we cannot conclude that the district court committed clear error in reaching this factual finding.

Both witnesses who testified on behalf of the government had significant contact with Green during his confinement and evaluation periods. Their testimony included specific and particularized medical opinions as they related to Green in light of his past mental health treatment, his current status and behaviors, the onset and management of his diabetes, as well as his responses to various mental health treatments at different periods of his life, including times during which he was a diabetic and those when he was not. Further, Dr. Sigurdson prepared a chronological chart detailing this information for the district court.

With respect to the proposed treatment plan, Dr. Sigurdson testified that if Green were willing to take an oral medication, she would prescribe Geodon and noted the specific dosage she would prescribe. She then discussed the potential side effects of this medication and noted that it would not likely exacerbate the weight gain concern as it related to Green's diabetes. Dr. Sigurdson also offered an alternative treatment plan in the event Green required a forcible injection. She recommended the injection of Haldol, noted the specific dosage, and discussed the potential side effects in light of Green's specific medical condition - diabetes - and his current prescribed medications. Finally, she noted that if Green decided he wanted to voluntarily return to taking Zyprexa, the anti-psychotic oral medication he had taken in the past, she would not object given the importance of forming a therapeutic alliance with Green.

Significantly, Dr. Griffin, Green's expert, did not disagree with Dr. Sigurdson's medical recommendations or proposed treatment plan, other than to indicate a preference for therapeutic treatment over forced medication. More importantly, Dr. Griffin established the firm caveat that he had no experience in the prison setting and had great respect for the professional abilities of both Drs. Sixcox and Sigurdson. In light of the record before the district court, we do not find that it committed a clear error in determining that involuntary medication as set forth in the record was medically appropriate for Green. *See Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006) (citing *Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir.1985)).

There is no evidence in the record to refute the conclusion that anti-pyschotic medication is in Green's best medical interest. Moreover, the proposed treatment plans recommended by Dr. Sigurdson, regardless of the drug, take into consideration the particularized medical needs of the

individual defendant, Green. It sets forth the specific medications, alternative means of injecting it, the specific dosage, and the potential side effects Green could face. The fact that Dr. Sigurdson offered alternatives depending on Green's reaction to forced medication only supports the individualized and appropriately tailored nature of her treatment plan. Offering alternatives does not alone render a proposed treatment plan defective for purposes of a *Sell* finding. *See e.g.*, *Evans*, 404 F.3d at 242, fn 14 ("We do not imply that the government may set forth only one treatment plan. Instead, the government may set forth alternative treatment plans in the event the primary treatment plan is defective for one reason or another."). Even the authority cited by Green acknowledges this point. *United States v. Hernandez-Vasquez*, 513 F.3d 908 (9th Cir. 2008).

Finally, we are not inclined to find a lack of specific directives fatal to the propriety of the *Sell* Order here. This is not a situation, such as that presented in *Evans* or *Hernandez-Vasquez*, where the government failed to present sufficient evidence to meet its burden, or a case where the defendant was denied the opportunity to present any independent medical evidence. *See e.g., United States v. Rivera-Guerrero*, 426 F.3d 1130 (9th Cir. 2005) (finding error where a district court relied exclusively on the government's physicians, and failed to grant the defendant a continuance to obtain its own expert in *Sell* proceeding). Rather, it is a situation where the district court simply chose not to incorporate all the evidence presented to it in its written order. Therefore, we assume, as did the district court, that Green will be medicated in accordance with the proposed treatment plans of Dr. Sigurdson as described at the hearing below. Further, how the plan is implemented depends, in part, on whether Green voluntarily takes the medication orally, or whether it must be given by injection.

A district court is not in the position, and does not possess the requisite knowledge to dictate a precise course of medical action for any defendant. Nor should it in order to avoid the "blank check" appellate challenge raised here. We require that the record is clear that physicians exercise their medical judgment and make decisions in accordance with prevailing medical standards, all while taking into account the particular needs and decisions of the individual patient. As noted, the detailed record before us shows a treatment plan with the specific medication or range of medications to be administered by the Bureau of Prisons, and under what circumstances each will be administered (e.g., voluntarily or forcibly), as well as the expected dosages and the expected time frame for achieving competence.

At the hearing in this case, Dr. Sigurdson outlined exactly this information for the district court. Green may consent to oral medication, and that course of treatment would be different than the one described with forcible injections. Having made the determination that each course of treatment recommended by Dr. Sigurdson is sufficiently tailored in its own right, we find that providing the Bureau of Prisons physicians the latitude and flexibility to adjust their treatment options to the responses provided by the patient, Green, is not only consistent with the Supreme Court's holding in *Sell*, but required by it in order to ensure that any course of treatment is medically appropriate. In the final analysis, Green asks us to substitute our Juris Doctor for a Medical Doctor. We decline to do so.

**III.**

For these reasons, we AFFIRM.

———————————

**DISSENT**

———————————

DAMON J. KEITH, Circuit Judge, dissenting. In its zeal to render Green competent to stand trial, the majority has given carte blanche to the government to forcibly administer whatever antipsychotic drugs it desires, whenever it chooses, using whichever method it deems appropriate. In so doing, the Court displays an astonishing indifference and disregard for Green's constitutional liberty interests. Because our Constitution demands so much more, I dissent.

The Supreme Court has long stressed the "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *accord Sell v. United States*, 539 U.S. 166, 178, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). Indeed, "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891). Only an essential or overriding state interest can overcome that constitutionally protected liberty interest. *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). While the Supreme Court noted that, "in certain instances," the government may deprive an individual of his liberty interest to refuse medical treatment, it emphasized that "those instances may be rare." *Sell*, 539 U.S. at 180. It is with respect for the sacred right of individuals to refuse unwanted medical treatment that I must evaluate the district court's order authorizing the government to forcibly medicate Green.

I.

In determining whether this case is a "rare" instance in which such orders are constitutionally permissible, *Sell* requires this Court to decide whether: (1) "*important* governmental interests are at stake"; (2) "involuntary medication will *significantly further* those concomitant state interests"; (3) "involuntary medication is *necessary* to further those interests"; and (4) "the administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 180-81 (emphasis in original). Not only must these four factors be met, but they must be demonstrated by "clear and convincing" evidence. *See United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004).

While I agree with the majority's holding that important governmental interests are at stake, I strongly disagree with the majority's conclusion that the second, third, and fourth factors are also satisfied. The district court's Order and the government's evidence neglected to identify the specific antipsychotic drug (or drugs) to be administered, the dosage range for that mystery drug, and the method of administration. Without these specifics, I fail to see how the majority can conclude that the second, third, and fourth *Sell* factors have been established under any standard—much less the "clear and convincing" standard.

II.

The second *Sell* factor requires the court to find that involuntary medication will "significantly further" the government's interests. *Sell*, 539 U.S. at 181. In so doing, the court must decide (1) "that administration of the drugs is substantially likely to render the defendant competent to stand trial[,]" and (2) "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.*

Here, the district court, relying on testimony from medical experts, concluded that forced medication is "substantially likely" to render Green competent to stand trial. (J.A. 239-40.) One of those experts, Dr. Donna Christine Sigurdson, testified that the fact that Green had responded well to treatment in the past indicates that the administration of antipsychotic drugs is substantially likely to restore Green's competency to stand trial. (J.A. 104-24.) When pressed on which specific antipsychotic drug she would administer to Green, Dr. Sigurdson testified that the antipsychotic drug, "if it was injectable," could "*either* be Geodon or Haldol." (J.A. 138.) (emphasis added). But she did not commit to a particular drug, stating, "I am not trying to be funny. I can't give you an honest answer that I know right now this day which I'd use."[1] *Id.*

At the conclusion of the hearing, it was not at all clear which antipsychotic drug (or drugs) would be forcibly administered to Green. And therein lies the fatal flaw in the government's evidence—an utter lack of specificity. Although testimony was offered about the different types of antipsychotic medication (such as "first generation" and "second generation" antipsychotic drugs, and "Haldol" and "Geodon"), the government never committed to any specific drug (or drugs) that it planned to administer to Green. Dr. Sigurdson said that there were several possible drugs that she could administer, but that the ultimate choice would be made through a "consensus" with her colleagues. (J.A. 136.)

Treatment without a specific plan can exert harmful consequences not only on Green's medical condition but also on his ability to stand trial. Certain types of "antipsychotic drugs might have side effects that would interfere with the defendant's ability to receive a fair trial."[2] *Sell*, 539 U.S. at 179. Some antipsychotic medications may actually render Green *incompetent* to stand trial. "Without at least describing the proposed course of treatment, it is tautological that the Government cannot satisfy its burden of showing anything with regards to that treatment, much less that it will '*significantly further*' the Government's trial-related interests and be 'medically appropriate' for" Green. *Evans*, 404 F.3d at 240 (emphasis added). The description of the proposed treatment, at the very least, "must identify: (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue . . ." *United States v. Hernandez-Vasquez*, — F.3d —, 2008 WL 170201, * 1 (9th Cir. Jan. 22, 2008). In order to meet the first prong of *Sell*, therefore, "[t]he government must propose a course of treatment in which it specifies the particular drug to be administered." *United States v. Evans*, 404 F.3d 227, 240 (4th Cir. 2005).

The fatal vagueness of the government's planned proposal is underscored by the district court's Order. The district court must determine "[w]hether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions." *Sell*, 539 U.S. at 185. Instead, the district court, in the most general terms possible, authorized the government "to involuntarily medicate the Defendant, *consistent with the prevailing standard of care for mental health professionals*, to restore [] [Green] to competence" to stand trial. (J.A. 243.) (emphasis added). But what exactly does the district court mean by "consistent with the prevailing standard of care for mental health professionals"? And

---

[1] Although the majority states that "Dr. Sigurdson provided detailed testimony regarding . . . the proposed treatment plan for Green," her testimony was at best speculative, as she refused to commit to a specific drug.

[2] For instance, "a patient taking 800 milligrams of Mellaril each day might suffer from drowsiness or confusion." *Riggins*, 504 U.S. at 137. The administration of Mellaril, therefore, could fail to render Green competent to stand trial because "such side effects [could have] an impact upon not just [the defendant's] outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." *Riggins*, 504 U.S. at 137.

more importantly, how does this "prevailing standard of care" affect Green? The district court's Order does not tell us. Nor does the record.

It is any wonder then that the majority can reasonably conclude that the government's treatment—exactly what treatment, we do not know—is "substantially likely" to render Green competent to stand trial. As the Fourth Circuit recognized, "[t]o approve of a treatment plan without knowing [or specifying] the proposed medication and dose range would give prison medical staff carte blanche to experiment with what might even be dangerous drugs or dangerously high dosages of otherwise safe drugs and would not give defense counsel and experts a meaningful ability to challenge the propriety of the proposed treatment." *Evans*, 404 F.3d at 241. Simply put, an unknown drug can never be substantially likely to do anything but keep its anonymity.

Although the majority claims that requiring more specificity would result in "substitut[ing] [the court's] juris doctor for a medical doctor," this argument overstates what *Sell* requires. *Sell* does not demand that the court act as a physician; it only calls for *some* specificity so that courts could accurately determine whether, by "clear and convincing" evidence, the government has met the four-prong *Sell* test before forcibly administering drugs to Green. This standard, at the very least, requires the government to identify the specific antipsychotic drug it plans to administer. *See Sell*, 539 U.S. at 181 ("Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success."). With respect to the dosage level, "a *reasonable range* rather than an exact dosage is appropriate." *Evans*, 404 F.3d at 241 (emphasis added). This sort of flexibility would allow Green's doctors "to adapt [his] treatment to fit the often vagarious bodily and psychical responses to medical treatment," *id.*, while providing the court with some assurance that Green's constitutional rights will not be violated. Thus, *Sell* permits a physician to exercise his or her medical discretion provided that there is at least some specificity to court orders that delineates the confines of forced medical treatment.

The majority tries to take refuge in the district court's August 24, 2006, Sealed Memorandum ("Memorandum"), claiming that it provides the requisite specificity. But the Memorandum is not the mandate of the court—the Order is. *See Bell v. Thompson*, 545 U.S. 794, 805, 125 S.Ct. 2825, 162 L.Ed.2d 693 (2005) ("Basic to the operation of the judicial system is the principle that a court speaks through its judgments and orders."). And the Order does not limit the government's authorization to "the proposed medical treatment." In determining Green's treatment, solely based on the Order, doctors may easily decide to administer a drug that was never mentioned during the district court proceedings, administer a drug that would produce negative effects on Green's diabetes, or even administer Mellaril, a first-generation drug that may impair competency to stand trial and that Justice Kennedy indicated should be forbidden except upon an "extraordinary showing." *Riggins*, 504 U.S. at 139-42 (Kennedy, J., concurring). Moreover, the Memorandum itself provides absolutely no specificity; the Memorandum never mentions a single antipsychotic drug that could potentially be administered to Green. (J.A. 236-42.)

There is, therefore, no clear and convincing evidence that administration of the drugs is *substantially likely* to render Green competent to stand trial—for the Court does not even know what that drug is. In short, if we do not know (and the district court's Order does not tell us) the specific antipsychotic medication with which Green is to be forcibly medicated, there cannot be clear and convincing evidence that the forced administration of it is substantially likely to render Green competent to stand trial. The district court accordingly committed clear error in concluding that involuntarily medicating Green would significantly further the Government's interest in bringing him to trial.

### III.

The district court's Order also fails the third prong—the requirement that the involuntary medication is "necessary." In assessing this prong, "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Sell*, 539 U.S. at 181. The government cannot demonstrate that involuntarily-administered antipsychotic medication is "necessary" if the government has not proffered clear and convincing evidence that the treatment would substantially further the government's interests. Unless there is evidence regarding the *specific* type of antipsychotic drug the government plans to administer to Green, it is impossible for the court to determine whether "any alternative, less intrusive treatments" are likely to achieve substantially the same results. *Id.* Some antipsychotic drugs may be taken orally (which would appear to be less intrusive); others must be injected (inherently more intrusive). But again, without knowing which antipsychotic drug the government plans to administer to Green, this Court cannot accurately determine whether Green's treatment is necessary and whether there is an alternative, less intrusive treatment.

### IV.

Finally, the fourth *Sell* requirement—"that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition"—is not met. *Id.* (emphasis in original). Green suffers from diabetes which may be aggravated by the administration of certain antipsychotic medications. Although Dr. Sigurdson testified about the relationship between diabetes and different types of antipsychotic medications, (J.A. 118-23), such generalizations hold little weight in the face of the required specificity of *Sell*. Where, as here, the government fails to commit to a specific medication or series of medications, there cannot be a clear and convincing showing that the administration of the antipsychotic drugs is in Green's best interest. *Evans*, 404 F.3d at 241 (vacating an order in which there was no discussion as to why the defendant, "an elderly man with diabetes, hypertension, and asthma who takes a number of medications to treat these conditions, would" be medically appropriate.).

And, even if there were "clear and convincing" evidence to this effect, the district court's Order certainly does not limit the government's authorization to forcibly administer antipsychotics that would not exacerbate Green's diabetes. It follows, therefore, that without specifying the course of treatment, the district court cannot accurately measure Green's best interests in light of his medical condition. As the Supreme Court noted in *Sell*, "[t]he specific kind of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." 539 U.S. at 181. Accordingly, it was clear error for the district court to sweepingly conclude that antipsychotic drugs were in Green's best interests.

### V.

There is little evidence—much less "clear and convincing" evidence—that the forced administration of antipsychotic drugs to Green would "significantly further" the government's interests, that it is even "necessary" to further those interests, and that forced medication is "medically appropriate" for Green. These determinations cannot be made without knowing (with specificity) which antipsychotic drug and what dosage of that drug would be administered. In its opinion, the majority substitutes judicial checks on forced medical treatment with a blank check, allowing physicians to do as they wish with a resistant patient. I **DISSENT**.