*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0103p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellee*,

　　*v.*

DENNIS M. GRIGSBY,

　　　　　　　*Defendant-Appellant.*

No. 11-3736

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:10-cr-105-1—Gregory L. Frost, District Judge.

Argued: October 3, 2012

Decided and Filed:  April 11, 2013

Before:  MERRITT, McKEAGUE, and STRANCH, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant.  Christopher K. Barnes, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.  **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant.  Christopher K. Barnes, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

　　STRANCH, J., delivered the opinion of the court in which, MERRITT, J., joined. McKEAGUE, J. (pg. 20), delivered a separate dissenting opinion.

_____

**OPINION**

_____

　　JANE B. STRANCH, Circuit Judge.  Dennis Grigsby, an Ohio pretrial detainee diagnosed with paranoid schizophrenia, appeals from the district court's order entered under *Sell v. United States*, 539 U.S. 166 (2003), allowing the government to medicate him involuntarily in an effort to restore his mental competency so that he can be

1

prosecuted on bank robbery charges. Because special circumstances unique to this case persuade us to conclude that Grigsby's liberty interest in avoiding involuntary medication outweighs the government's interest in prosecution, we REVERSE the medication order and REMAND for further proceedings.

## I. PROCEDURAL HISTORY

The government charged Grigsby with three counts of unarmed bank robbery in violation of 18 U.S.C. § 2113(a). The robberies occurred at different banks in the greater Columbus, Ohio, area between January and March, 2010. The government alleged that Grigsby, a middle-aged person living in homeless shelters, stole approximately $7,482.00 from bank tellers by force, violence or intimidation. The FBI linked Grigsby to the robberies through eyewitness identifications and physical evidence. He was arrested and detained without bond pending trial.

Grigsby's counsel filed an unopposed motion pursuant to 18 U.S.C. §§ 4241(a) & 4242 requesting mental evaluations to determine if Grigsby is competent to stand trial and whether he was sane at the time of the offenses. The district court granted the motion, and Grigsby was transferred to the Metropolitan Correctional Center in New York (MCC-New York) for the evaluations.

Two psychologists conducted the examinations and filed reports with the district court. They diagnosed Grigsby with paranoid schizophrenia and determined that he was not competent to stand trial. They offered contradictory findings with regard to whether Grigsby was sane at the time of the bank robberies. The reports stated both that Grigsby's mental disease did not significantly interfere with his appreciation of the wrongfulness of his acts and that there was insufficient information to opine whether mental disease impaired Grigsby's ability to appreciate the wrongfulness of his conduct.

During a short competency hearing, neither party objected to the report findings or to the district court's decision to adopt the findings. The court committed Grigsby to the custody of the Attorney General pursuant to 18 U.S.C. § 4241(d)(1) in November

2010 for a period not to exceed four months to determine whether he could be restored to mental competency for the purpose of standing trial.

Grigsby was evaluated at the Federal Medical Center in Butner, North Carolina (FMC-Butner). In March 2011, Dr. Robert C. Lucking, Staff Psychiatrist, and Dr. Angela Walden Weaver, Staff Psychologist, jointly filed a forensic evaluation with the district court. Like the staff at MCC-New York, they found that Grigsby suffers from paranoid schizophrenia. Their forensic evaluation included a number of findings, including the following. Despite relatively normal upbringing, education, and employment, Grigsby stopped working due to "job burnout." His criminal history included convictions in 2006 for grand theft auto, disorderly conduct, and resisting arrest; in 2007 for criminal trespassing; and in 2010 for resisting arrest. He served short jail sentences for his convictions and probation violations. Grigsby was charged with voyeurism and menacing by stalking, but was not convicted of those charges. He was in good physical health, denied illegal drug use, never received mental health treatment or counseling, and was not taking psychotropic medication for mental illness.

The evaluation revealed that during interviews, Grigsby's dress and grooming were appropriate for the setting, his psychomotor activity was normal, his eye contact was adequate, and his facial expression was responsive. He was oriented to person, place, time, and circumstances; he denied suicidal, homicidal, or aggressive thoughts, plans, or intent; and, his affect was adequate and appropriate to the content of the conversation. Grigsby did not have any speech or language deficits, but his conversation was not "linear, logical or goal directed." While he denied hallucinations and delusions, he displayed substantial evidence of thought disorder in content and form including an extensive, but poorly organized, paranoid religious delusional system that extended to all major functional areas of his life. Housed in an open mental health unit, Grigsby followed the rules and procedures without any problem and was never segregated for disciplinary reasons. He did not require restraints or seclusion and did not engage in any conflicts with peers or staff. He socialized with his peers, but he did not volunteer to work or participate in any activities.

The forensic evaluators concluded that Grigsby did not understand the seriousness of his legal difficulty and lacked the ability to assist his lawyer during trial as a result of his psychotic symptoms. They also concluded that he was not capable of waiving his constitutional rights rationally or of testifying on his own behalf.

Grigsby refused to take oral medication to treat his schizophrenia. Because he was not gravely disabled and did not present a danger to himself, others, or the safe and secure operation of the facility, he did not meet the criteria for involuntary medication under *Washington v. Harper*, 494 U.S. 210 (1990). Consequently, the evaluators requested a judicial order under *Sell* that would authorize them to inject Grigsby involuntarily with a first-generation antipsychotic drug, such as haloperidol (Haldol) or fluphenazine, or a second-generation antipsychotic drug, risperidone, for the purpose of restoring him to competency. These injectable medications can cause serious side effects that require the administration of additional medications.[1]

The evaluators opined that antipsychotic medication was substantially likely to render Grigsby competent to stand trial and substantially unlikely to produce side effects that would interfere with his ability to assist his attorney in preparing a defense. They estimated that medication would have to be administered involuntarily for at least four months to restore Grigsby's competency. They further reported that less intrusive treatments, such as psychotherapy, were not likely to restore Grigsby to competency, and that antipsychotic medication was medically appropriate for Grigsby.

---

[1]The record contains extensive information about the efficacy and side effects of these medications. The primary side effects are as follows.

The first-generation antipsychotic medications, haloperidol and fluphenazine, can cause pseudoparkinsonism (stiffness, shuffling, tremors, slow movements, stooped posture, difficulty walking), akathisia (an inner sense of restlessness causing continual movement, such as rocking, moving the feet, and crossing and uncrossing the legs), and acute dystonic reactions (sustained excessive contraction of the large muscle groups of the neck, tongue, and jaw, which produce abnormal twisting postures). Long-term use of these drugs can cause tardive syndromes, including tardive dyskinesia (rhythmic involuntary movements, such as grimacing or frowning, pursing or puckering the lips, chewing or clenching the jaw, rolling the tongue, and blinking the eyes), tardive akathisia (the persistence of akathisia), and tardive dystonia (sustained muscle contractions of the face, eyes, neck, limbs, back, or trunk). The tardive syndromes are treated with medications, some of which have their own side effects. Tardive syndromes may be irreversible.

The second-generation antipsychotic medication, risperidone, can cause significant weight gain and a moderate risk for the development of metabolic syndrome, which involves abdominal obesity, insulin resistance, high blood pressure, and serum lipid abnormalities. If not treated, this syndrome can lead to significant complications, such as the development of diabetes mellitus and cardiovascular disease.

Grigsby opposed the government's motion seeking a judicial order. The court held a *Sell* hearing. Grigsby contended there and before this court that, even if he is rendered competent within four months, he will be required to remain on antipsychotic medication at least until he is tried, and the longer the period to trial, the greater the likelihood that he will develop serious side effects that will impact his ability to assist in his own defense—a point supported by Dr. Lucking's statistics indicating that substantial numbers of patients develop these side effects. Grigsby expressed particular concern about developing tardive dyskinesia, which causes "grotesque involuntary movements," and akathisia, which causes constant movement and an inability to remain still. He noted his fear that these side effects would prevent him from maintaining a dignified appearance before the jury and would make it extremely difficult for him to assist his counsel or testify on his own behalf.

Dr. Lucking testified at the *Sell* hearing that Grigsby's thought disorder is severe and he needs biologic treatment to restore his competency. He could not say how long Grigsby had been psychotic or whether he had suffered one or multiple psychotic episodes, but he surmised that this may have been the first psychotic episode to get Grigsby into trouble. While he explained the differences between types of antipsychotic medications and their side effects, he was not asked to specify the particular antipsychotic drug or dose that he would administer to Grigsby, although that information is contained in the forensic report.

Dr. Lucking could not say how often he met with Grigsby or how much time he spent evaluating him. He discussed the positive signs of schizophrenia—delusions, hallucinations, cognitive disorganization, and grossly disorganized behavior—and testified that Grigsby presented delusions and cognitive disorganization, but not hallucinations or grossly disorganized behavior. He also listed the negative signs of schizophrenia but indicated that paranoid schizophrenics, including Grigsby, do not have negative symptoms. Dr. Lucking further testified that patients who are "treatment naive" and have positive symptoms of schizophrenia, like Grigsby, tend to respond to medications better than those patients who have experienced years of psychosis, show

negative symptoms, and have had multiple medication failures. He believed that Grigsby would show a positive response to medication, but he acknowledged that ten to thirty percent of patients show little or no response and an additional thirty percent show only a partial response. In his opinion, a thirty percent response to psychotropic medication would be enough to render Grigsby competent. Until Grigsby's schizophrenic symptoms decrease, Dr. Lucking declined to render an opinion on whether Grigsby can be held criminally responsible for the bank robberies.

When asked what would happen next if Grigsby were not forcibly medicated, Dr. Lucking stated that Grigsby would remain psychotic, and the district court would likely require FMC-Butner to perform a risk assessment to determine whether he is a danger to people or property. If he is found to be a danger, Dr. Lucking would ask the government to request civil commitment of Grigsby under 18 U.S.C. § 4246. If the court determines that Grigsby is dangerous, he could be civilly committed to a secure federal mental health facility on an indefinite basis, unless the Bureau of Prisons is able to find a facility, such as an adult group home, that would accept him on conditional release. Although Grigsby did not pose a risk of harm to staff or fellow inmates at FMC-Butner, Dr. Lucking stated that Grigsby was not necessarily fit for release into society.

Dr. Jeffrey Smalldon, a clinical psychologist, testified on Grigsby's behalf. He agreed with Dr. Lucking that Grigsby suffers from a severe mental illness and that a criminal responsibility assessment cannot be completed so long as Grigsby is mentally incompetent. Because Dr. Smalldon is not a physician, he could not render an opinion on whether Grigsby should receive antipsychotic medication. He recognized that treatments less intrusive than forced medication are available, but mental health professionals widely recognize that the efficacy of such treatments may be low without some use of medication.

Dr. Smalldon could not say with precision when Grigsby's chronic mental disorder began, but he offered an opinion, based on reasonable psychological certainty, that Grigsby suffered from the same mental illness in early 2010 during the time period

the bank robberies occurred. He expressed his belief that Grigsby could pursue a defense of not guilty by reason of insanity.

Following the *Sell* hearing, the district court granted the government's motion and ordered involuntary medication. The court stayed the order, however, and this interlocutory appeal followed. We have jurisdiction pursuant to the collateral order doctrine. *See Sell*, 539 U.S. at 177.

## II. ANALYSIS

In *Washington v. Harper*, 494 U.S. 210, 229 (1990), the Supreme Court recognized that forcible injection of medication into the body of a non-consenting person "represents a substantial interference with that person's liberty." The Court held that due process allows the involuntary medication of a convicted, but mentally ill, prison inmate if medical professionals determine that the inmate is dangerous to himself or others and that the treatment is in the inmate's medical interest. *Id.* at 227. In a later case, the Court stated that the "Fourteenth Amendment affords at least as much protection to persons the State detains for trial" and set aside a criminal conviction where the state court did not make sufficient findings to permit the involuntary administration of antipsychotic medication to a defendant during trial. *Riggins v. Nevada*, 504 U.S. 127, 135–38 (1992).

In *Sell*, the Supreme Court ruled that the Constitution allows the government to forcibly medicate a mentally ill criminal defendant who is not a danger to himself or others in order to render that defendant competent to stand trial for serious crimes. 539 U.S. at 169. Before administering antipsychotic medication involuntarily, the government must prove to the district court by clear and convincing evidence that: (1) an important governmental interest in prosecution exists; (2) involuntary medication will significantly further the governmental interest, which requires proof both that administration of the medication is substantially likely to render the defendant competent to stand trial and is substantially unlikely to cause side effects that will interfere significantly with the defendant's ability to assist counsel in conducting the trial defense; (3) involuntary medication is necessary to further the governmental interest; and

(4) administration of the drugs is medically appropriate for the defendant. *Id.* at 180–81; *United States v. Green*, 532 F.3d 538, 545 (6th Cir. 2008). The first *Sell* factor is a legal question that we review *de novo*. *Green*, 532 F.3d at 546. Because the remaining three factors involve factual findings, we review the district court's determinations on them for clear error. *Id.* at 552.

Grigsby concedes that the government has an important interest in bringing him to trial for a serious crime like bank robbery, *see Sell*, 539 U.S. at 180, and we agree with his assessment. There is no dispute that an important governmental interest in prosecution exists.

The Supreme Court authorizes a fact-intensive inquiry, however, to determine whether there are any special circumstances that lessen the importance of the asserted governmental interest in having a trial. *See id.*; *United States v. White*, 620 F.3d 401, 411 (4th Cir. 2010). Grigsby contends that the potential availability of lengthy civil confinement coupled with the likelihood that, even if he is restored to competency, he will be found not guilty of the bank robberies by reason of insanity greatly tempers the government's interest in prosecution.

Indeed, the Supreme Court recognized in *Sell* that the "defendant's failure to take drugs voluntarily . . . may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell*, 539 U.S. at 180. The Court did not suggest that civil commitment replaces prosecution; rather, the "potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution. The same is true of the possibility that the defendant has already been confined for a significant amount of time" for which he would receive credit toward any sentence imposed under 18 U.S.C. § 3585(b). *Id.* *Sell* adds a further special consideration that the government always has "a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." *Id.* The Supreme Court set out these particular special circumstances by way of example, *see id.*, and "we can discern no basis for believing that in fashioning this short list, the *Sell* Court intended

that lower courts treat it as having exhausted all possible 'special circumstances.'" *White*, 620 F.3d at 411 n.8.

Regarding the first *Sell* special circumstance that tempers the government's interest in prosecution, significant evidence was presented at the *Sell* hearing that Grigsby may face a lengthy civil commitment due to his mental illness. Dr. Lucking testified that if Grigsby is not forcibly medicated, he will remain psychotic and, if found to be a danger, the medical staff at FMC-Butner will request civil commitment of Grigsby under the statutory procedures outlined in 18 U.S.C. § 4246. Under that statute, the director of FMC-Butner must certify to the district court that Grigsby, who was committed under 18 U.S.C. § 4241(d) for a competency determination, "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available." If, after a hearing, the district court were to determine by clear and convincing evidence that Grigsby is suffering from a mental disease or defect and poses a substantial risk of bodily injury or serious damage to the property of another, the court could order Grigsby civilly committed to the custody of the Attorney General, who has a statutory obligation to make all reasonable efforts to convince the State of Ohio to take custody of Grigsby and find an appropriate placement for him. 18 U.S.C. § 4246(d). If such efforts fail, the Attorney General must hospitalize Grigsby in a suitable federal facility for the mentally ill until his "mental condition is such that . . . his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. §§ 4246(d)(2), 4246(e).

On the record before us, Grigsby may be destined for lengthy civil commitment under § 4246. *See Sell*, 539 U.S. at 180. Dr. Lucking explained that Grigsby is presently suffering from a mental disease or defect. Although Grigsby does not pose a present danger to himself or others in the structured environment of FMC-Butner, Dr. Lucking

opined that Grigsby is not necessarily fit for release into society. If Grigsby is not medicated involuntarily, the next step is to consider civil commitment under § 4246.

The district court did not specifically address Dr. Lucking's testimony regarding potential civil commitment under § 4246 when analyzing whether the government's interest in prosecution is mitigated by the special circumstance of potential lengthy civil commitment. The court focused instead on whether Grigsby would be civilly committed if he were ultimately found to be not guilty by reason of insanity, *see* 18 U.S.C. § 4243, found the evidence inconclusive on that point and terminated its inquiry. But *Sell* asks whether the special circumstance of potential for future civil confinement lessens the importance of the government's interest in prosecution; it posits potentiality because at the initial stage at which this determination must be made, it cannot be definitively established that a defendant ultimately will be found not guilty by reason of insanity. That Grigsby potentially may be found not guilty by reason of insanity, even if he is restored to mental competency to stand trial, is a special circumstance that should have been fully considered in weighing the government's interest in prosecution. *See United States v. Stephenson*, No. 1:10-CR-206, 2011 WL 3738967, at *8 (W.D. Mich. Aug. 23, 2011); *United States v. Walton*, No. 08–20599–BC, 2009 WL 3562507, *2 (E.D. Mich. Oct. 28, 2009)(recognizing the special circumstance that a likelihood of a verdict of not guilty by reason of insanity would undermine the government's interest in prosecution (citing *United States v. Sheets*, No. 3:07–CR–68, 2008 WL 4614330, at *3 (E.D. Tenn. Oct. 15, 2008)).

A full consideration of the potential for civil commitment under § 4243, moreover, reveals that there is evidence in this record supporting a conclusion that Grigsby may not have appreciated the wrongfulness of his conduct during the bank robberies, despite other evidence indicating that Grigsby knew what he was doing was wrong. Dr. Lucking and Dr. Smalldon agreed that Grigsby would have to be restored to mental competency before a definitive determination could be made concerning his sanity at the time of the offenses. Nonetheless, Dr. Smalldon highlighted Grigsby's severe and chronic disorder. Based on a reasonable degree of psychological certainty,

Dr. Smalldon opined that it was highly likely Grigsby suffered from the same mental illness when the bank robberies occurred, making him "a candidate" for the defense of not guilty by reason of insanity. The district court did not allude to that portion of Dr. Smalldon's testimony in its analysis. Dr. Lucking also surmised that, because Grigsby's mental condition is severe, he may have experienced previous psychotic episodes, with this one being the first to "get him into trouble." These comments suggest a connection between Grigsby's psychotic episodes and the instant offenses.

In sum, the *Sell* special circumstance—potential for lengthy civil commitment of Grigsby—lessens the importance of the government's interest in prosecution because it reduces the risks that would normally attach if Grigsby were freed without punishment. The district court's opinion focused only on the possible track toward civil commitment under § 4243 without giving any consideration to the second possible track toward civil commitment under § 4246—the track that Dr. Lucking had noted. Section 4246 and § 4243 provide different procedures for civil commitment that may apply in Grigsby's case. Both of these tracks establish a special circumstance that should have been examined.

The dissent contends that the potential for civil commitment under either § 4246 or § 4243 is "largely speculative" and Grigsby is unlikely to prevail on an insanity defense. Application of either § 4246 or § 4243 is a fact-specific inquiry that cannot be resolved definitively at this point, yet *Sell* directs us to consider whether the governmental interest in prosecution is affected by the potential for lengthy civil commitment. Outcomes in similar cases before other courts depended heavily on the specific facts in the available records.

For example, in *United States v. Gutierrez*, 704 F.3d 442, 450 (5th Cir. 2013), the defendant did not appear to be eligible for civil commitment under federal or state law because he did not present a danger to himself or others while confined, he was not severely disabled by mental illness, and, other than making the telephonic threats at issue in the case, his criminal record contained no evidence of past violence. Under those factual circumstances, the Fifth Circuit determined that the government's interest in

prosecution was not diminished. *Id.* By contrast, this record shows that Grigsby suffers from a severely disabling mental illness, and he is charged with committing serial bank robberies by force and intimidation. Even Dr. Lucking cautioned that Grigsby may not be fit for return to society. These factual circumstances distinguish our case from *Gutierrez.*

In *United States v. Nicklas*, 623 F.3d 1175, 1178–79 (8th Cir. 2010), the defendant argued that forcibly medicating him would place him in the same position that he currently faced—civil commitment in a medical facility if he were found to be a danger to others or their property. Such a result was not certain, the Eighth Circuit said, because Nicklas confirmed that he would not present an insanity defense if brought to trial and thus, the government's interest in prosecution was not ameliorated. *Id.* Grigsby, on the other hand, presented evidence at the *Sell* hearing that he likely was not sane at the time he committed the alleged offenses and that he may have a basis for an insanity defense. In *United States v. Evans*, 404 F.3d 227, 239 (4th Cir. 2005), proof was offered that the defendant did not meet the criteria for civil commitment under § 4246. No similar proof was offered here. To the contrary, the government's witness suggested that the next step for Grigsby is a § 4246 evaluation. *See also United States v. Gomes*, 387 F.3d 157, 161 (2d Cir. 2004) (noting available psychiatric diagnosis related to initial competency determination and not the risk Gomes might pose to other persons or property, to be evaluated under § 4246). *Cf. United States v. Bradley*, 417 F.3d 1107, 1116–17 (10th Cir. 2005) (summarily rejecting potential for civil commitment under § 4246 where treating physician reported defendant was not a threat to self or others while in custody, despite acknowledgment that physician had not yet fully evaluated under § 4246 whether defendant posed any risk to persons or property outside the facility).

These cases do not stand for a blanket rule that, short of certain proof that civil commitment will occur, the government's interest in prosecution is not diminished. Instead, these cases point to the requirement in *Sell* that courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution." *Sell*,

539 U.S. at 180. And this takes us back to the Supreme Court's listing of the special circumstances that may lessen the importance of that interest and its articulation of one as the "potential" for future civil confinement. The Supreme Court could have required a certainty of future civil confinement. It did not; so we should not.

Grigsby has not yet been fully evaluated for civil commitment under the § 4246 standard, but Dr. Lucking testified at the *Sell* hearing that a risk assessment under § 4246 is the likely next step if Grigsby is not forcibly medicated. Dr. Lucking's expert opinion that Grigsby may not be fit for release into society indicates that, after a risk assessment, the government may be able to carry its burden to prove that Grigsby presents a "substantial risk of bodily injury to another person or serious damage to property of another" under § 4246, even if he has been well-behaved and non-violent within the structured detention of FMC-Butner. In addition, Dr. Smalldon testified to a reasonable degree of psychological certainty that Grigsby may be able to raise an insanity defense. *See Thompson v. Bell*, 580 F.3d 423, 440 (6th Cir. 2009) (referring to *Sell* as a signal "that it may be unconstitutional to medicate a prisoner already destined for a lengthy confinement just to render the prisoner competent for legal proceedings").

In addition to considering whether civil commitment is a potential outcome, we must also examine whether the length of Grigsby's confinement while the government attempts to restore his competency and prosecute him may approximate the length of any sentence of imprisonment he ultimately may receive if convicted. *See Sell*, 539 U.S. at 180. This analysis required by the Supreme Court is entirely separate and distinct from determining at the outset whether the statutory maximum penalty for the crime objectively establishes the seriousness of the crime and the government's interest in prosecuting it, which is not in dispute here. *See Green*, 532 F.3d at 546.

The government posits that, if convicted, Grigsby would likely face an advisory guideline range of 57 to 71 months in prison. The government estimated this range as follows: Grigsby's base offense level would be 20 under USSG § 2B3.1(a); two levels would likely be added under § 2B3.1(b)(1) because money was taken during the robberies; and three grouping levels would likely be added under USSG § 3D1.1,

§3D1.2(d), and § 3D1.4(a) for a total offense level of 25.  Even assuming Grigsby falls within criminal history category I, the advisory guideline range would be 57 to 71 months.

The government's analysis is instructive because government attorneys routinely estimate potential guideline ranges and sentences in the course of negotiating plea agreements with defense counsel, sometimes resulting in a plea agreement for a specific sentence or sentencing range that is binding on the sentencing court.  Fed. R. Crim. P. 11(c)(1)(C).  Certainly, a final guideline calculation cannot be known until a district court announces it.  But we give significant weight to the government's estimate of sentence length because the government advances a sentence of imprisonment as the core reason why it wants to prosecute Grigsby.  The government stands in the best position to elucidate its prosecutorial interests.  *See White*, 620 F.3d at 415–18 (examining likely sentence mentally ill defendant would receive under guidelines).

To consider only the statutory maximum penalty when conducting this portion of the *Sell* analysis would not be consistent with Supreme Court precedent after *United States v. Booker*, 543 U.S. 220 (2005).  Sentencing is based on the advisory Sentencing Guidelines and the sentencing factors under 18 U.S.C. § 3553(a).  In the ordinary case, appellate courts apply a presumption of reasonableness to a sentence within a properly calculated advisory guideline range that is imposed and explained in accordance with the § 3553(a) factors.  *See Rita v. United States*, 551 U.S. 338, 347 (2007); *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc).  Courts evaluate whether a particularly harsh or lenient sentence outside the advisory guideline range is reasonable in light of the § 3553(a) factors.  *See Gall v. United States*, 552 U.S. 38, 46–47 (2007).  No facts in this record would support the reasonableness of a 240-month sentence upon conviction, which would constitute an upward variance of 169 months from the top of the government's proposed advisory guideline range of 57 to 71 months.  *See United States v. Aleo*, 681 F.3d 290, 293 (6th Cir. 2012) (reversing and remanding for resentencing because district court did not justify under the § 3553(a) factors a statutory maximum sentence of 720 months where the advisory guideline range was 235 to 293

months).  We see no principled reason to ignore all applicable sentencing law except for the statutory maximum penalty when considering under *Sell* whether the likelihood of civil commitment will approximate the criminal sentence ultimately imposed on conviction and thus mitigate the government's interest in prosecution.  *See White*, 620 F.3d at 415–18.

The estimated guideline calculation for Grigsby's case should also take into account, however, the literature Dr. Lucking reviewed in the forensic evaluation documenting that some defendants who are restored to competency by medication ultimately plead guilty to the charges against them through plea negotiation.  If we consider that Grigsby might enter a timely guilty plea if restored to competency, thereby earning a three-level reduction for acceptance of responsibility under USSG § 3E1.1, his anticipated advisory guideline range would drop to 41 to 51 months.

To compare the length of Grigsby's potential incarceration upon conviction with the length of any potential civil commitment, we must further take into account how long Grigsby would have to be medicated involuntarily in order to reach competency to stand trial.  The forensic evaluation summarized psychiatric studies showing that seventy percent of first-episode patients often can be restored to competency within three to four months and eighty-three percent by the end of one year.  The forensic evaluation report suggested Grigsby would have to be medicated at least four months.  In Dr. Lucking's expert opinion, Grigsby is severely disabled by mental disease and he probably experienced other psychotic episodes before the one that led to his arrest in this case.  In light of this uncontradicted information and using the psychiatric literature in the record as our guide, we conclude that Grigsby may well require involuntary medication for a period of at least four and up to twelve months.

Grigsby has been held in federal detention on the bank robbery charges since July 2010, a period of 33 months.  If his competency can be restored through forced medication within four to twelve months, and if we take into account the time that will be necessary to complete the prosecution (which could include further delays caused by one or more relapses into incompetency), Grigsby may remain in federal detention for

a period roughly equivalent to the length of any prison sentence he may ultimately receive and for which the Bureau of Prisons is required to give him sentencing credit. *See* 18 U.S.C. § 3585(b)(1)("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed"). Consequently, these additional sentencing considerations also mitigate the government's interest in prosecution, especially in light of the Supreme Court's comment that instances of involuntary medication "may be rare." *Sell*, 539 U.S. at 180.

Finally, the Supreme Court identified one other special circumstance that lessens the government's interest in prosecution—the government's "concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." *Id.* Forcibly medicating a defendant with psychotropic drugs can burden fair trial rights by affecting the defendant's capacity to comprehend and react to trial events, consult with counsel, testify, and control his behavior in front of the jury. *See e.g.*, *Riggins*, 504 U.S. at 137–38. In *Sell* the Supreme Court reaffirmed these concerns, observing that "[w]hether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence." *Id.* at 185.

This aspect of the first *Sell* factor dovetails into the remaining three factors: whether antipsychotic medication is substantially likely to render Grigsby competent to stand trial and is substantially unlikely to cause side effects that will interfere significantly with his ability to assist defense counsel; whether involuntary medication is necessary to further the government's interest; and whether involuntary medication is medically appropriate for Grigsby. *See id.* at 181. Grigsby raises trial-related concerns about tardive dyskinesia, which causes "grotesque involuntary movements," and akathisia, which causes constant movement and an inability to remain still. Should such uncontrollable physical side effects develop, he believes they would impair his

ability to maintain a dignified appearance before the jury and would make it difficult for him to assist his counsel or testify in his own behalf.

The record indicates that psychotropic medication is generally effective in restoring competency, although Dr. Lucking testified that up to thirty percent of patients treated with haloperidol show no response to the drug and another thirty percent show only a partial response. When he reviewed six factors used to determine the likelihood of an individual's positive response to the medication, only two of those factors suggested that Grigsby would show a positive response to medication. It is undisputed, based on Dr. Lucking's testimony, that thirty percent of individuals treated with haloperidol develop pseudoparkinsonism, twenty to thirty percent develop akathisia, and two to ten percent develop acute dystonic reactions. The irreversible condition of tardive dyskinesia develops in eighteen to forty percent of medicated individuals.

Even assuming the district court's findings are correct that medication is substantially likely to render Grigsby competent to stand trial and that such drugs are medically appropriate for him, the record lacks clear and convincing evidence that medication is substantially unlikely to cause side effects that will interfere significantly with Grigsby's ability to assist in his own defense at trial and that involuntary medication is necessary to further the government's lessened interest in prosecution. To this extent the district court's factual findings are clearly erroneous. *See Green*, 532 F.3d at 552.

The dissent points to Dr. Lucking's testimony that other medications will be used to alleviate the side effects of psychotropic medication and that Dr. Lucking would "cease medicating Grigsby if irreversible side effects occurred." But by that time, it would be too late for Grigsby. The side effects would be both evident and irreversible, psychiatric medication would be stopped, and Grigsby probably would not be returned to competency to stand trial after all.

Dr. Lucking did explain that certain drugs may help relieve *temporary* side effects, but not the irreversible ones, and those drugs have their own side effects, requiring additional medications. And there is no proof that any potentially temporary

side effects would be caught and treated early enough to avoid permanency or lasting damage or that Grigsby could tell his counsel about any untreated side effects so that his concerns could be brought to the attention of the court. Psychiatric professionals have already determined that Grigsby is too mentally ill to assist in his own defense. The record reveals no basis for the assumption that Grigsby's defense attorney, located hundreds of miles from his mentally ill client, would know during the period for restoring competency whether Grigsby had developed side effects and whether the attending physicians had taken steps to address those side effects in a timely and proper manner.

The Supreme Court counsels us to ask: "Has the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it?" *Sell*, 539 U.S. at 183. On this record, our answer to the question is "no." *See Sell*, 539 U.S. at 180, 183; *White*, 620 F.3d at 419.

## III. CONCLUSION

Each involuntary medication case presents a court with the challenging task of balancing the defendant's fundamental constitutional right to liberty against the government's important interest in prosecution. A fact-intensive inquiry into the circumstances of each defendant is necessary to determine where to strike that balance. That inquiry entails recognition of the difficulties inherent in dealing with mentally disabled defendants and the problems likely to be encountered when the balance favors medication—and when it does not. It cannot be ignored that when either side wins its position, that success is at best a mixed blessing. For a defendant, success in avoiding forced medication means he does not receive potentially harmful—but also potentially beneficial—medication and the cost of that avoidance may be lengthy or even lifetime involuntary commitment to an institution for the mentally ill. For the government, obtaining medication by force does not guarantee: return to competency for trial; or if competency is obtained, that prosecution will be successful; or if prosecution is

successful, that post-incarceration problems will not result in risks to society that civil commitment might have avoided. It is not an exaggeration to suggest that there is no adequate solution to the difficulties presented by these cases. Perhaps it is for this reason that the Supreme Court created such a fact-intensive, balancing-of-interests standard.

In executing the hard task of applying that standard to this case, we are mindful that forcing psychotropic medication on a pretrial detainee "is impermissible absent a finding of overriding justification and a determination of medical appropriateness." *Riggins*, 504 U.S. at 135. Reviewing the specific facts here in light of the standard articulated in *Sell*, we find that the government did not establish that its prosecutorial interests are sufficiently exceptional to warrant the extraordinary use of forcible medication to render Grigsby competent to stand trial.

Accordingly, we REVERSE the district court's order permitting involuntary medication and we REMAND the case for further proceedings consistent with this opinion. On remand, we envision use of the procedures outlined in 18 U.S.C. § 4246 to determine whether civil commitment is appropriate for Grigsby.

―――――――――――

**DISSENT**

―――――――――――

McKEAGUE. Circuit Judge, dissenting.  The majority rightfully concludes that the government has an important interest in prosecuting Grigsby, but then reverses the district court's decision by concluding the government's important interest is undermined by the unique special circumstances of this case.  I disagree with the majority's special-circumstances analysis for a number of reasons.  Based upon the record before us, involuntary civil commitment under § 4246 is largely speculative, and though Grigsby might be able to pursue an insanity defense, he is unlikely to prevail on that defense.  In addition, because of the sheer number of assumptions in the majority's analysis, I disagree that Grigsby's term of pretrial confinement is likely to exceed any sentence he would ultimately receive.  With regard to Grigsby's fair-trial rights, the majority's analysis is again largely speculative—we cannot know what side effects, if any, Grigsby will encounter until he is medicated.  Further, Dr. Lucking testified that he would attend to treatable side effects and cease medicating Grigsby if irreversible side effects occurred.  Because the government has an important interest in prosecuting the defendant, because of the speculative nature of the special circumstances considered by the majority, and because I find no error in the district court's consideration of the other *Sell* factors, I would affirm.  I therefore respectfully dissent.