DAVIS, Circuit Judge,
dissenting:
I respectfully dissent.
I
At bottom, the majority’s concern appears to be that, absent our affirmance of the involuntary medication order, Sander-son will continue to live in society with an untreated mental illness, contrary to the advice of doctors. However noble that concern, Sell v. United States permits involuntary medication only for the purpose of rendering a pretrial detainee competent to stand trial, and only in those “limited circumstances” in which the government’s interest in prosecution is “essential” or “overriding.” 539 U.S. at 169, 178-79, 123 S.Ct. 2174 (2003). The government has failed to establish such an interest here.
If nothing else, the record shows that Sanderson has not and will not register. There is no reason to believe that merely convicting him (again) will impel him to do so. Today, he is a mentally disordered, non-violent felon on lifetime probation in the Commonwealth of Virginia. After he is forcibly medicated and competently pleads guilty (as he undoubtedly will, see infra p. 242 n. 6), he will become one of the more than a million mentally ill inmates across the country. See U.S. Dep’t of Justice, Bureau of Justice Statistics, Doris J. James & Lauren E. Glaze, Mental Health Problems of Prison and Jail Inmates 1 (2006), available at http://bjs.gov/ content/pub/pdf/mhppji.pdf (“At midyear 2005 more than half of all prison and jail *239 inmates had a mental health problem, including 705,600 inmates in State prisons, 78,800 in Federal prisons, and 479,900 in local jails. These estimates represented 56% of State prisoners, 45% of Federal prisoners, and 64% of jail inmates.”). He may then refuse his medication, increasing the likelihood that he will, upon release, remain a mentally disordered, non-violent felon on lifetime probation in the Commonwealth of Virginia, who probably will not register. The idea that forced medication of Sanderson will preclude the possibility that he will continue to live in society with an untreated mental illness, contrary to the advice of doctors, is fanciful, at best.
II
There are several more specific reasons I am compelled to dissent.
As a preliminary matter, although the majority acknowledges that the government bears the burden of proving, “by clear and convincing evidence,” that “important governmental interests are ... not outweighed by special circumstances,” ante, at 235 (citing Sell, 539 U.S. at 180-81, 123 S.Ct. 2174; United States v. Bush, 585 F.3d 806, 813-14 (4th Cir.2009)), in light of the dramatically weakened governmental interests discussed herein, it appears to me to have applied a preponderance standard. See Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir.2001) (“[Cjlear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable.”) (internal quotation marks, citations, and alterations omitted). In this case, the government falls short of meeting that heavier burden, as the record fails to show it is “highly probable” that either Sanderson, the government, or the public at large will enjoy a lasting benefit by affirmance of the district court’s order. See United States v. White, 620 F.3d 401, 422 (4th Cir.2010).
Furthermore, contrary to the majority’s unsupported assertion, the “nature of the crime” does not “weight ] in favor of forcible medication.” Ante, at 236. The relevant crime is failure to register, not sexual assault, cf. United States v. Myers, 598 F.3d 474, 477-78 (8th Cir.2010) (noting that a defendant’s act of sexually assaulting a child in 1996 was distinct from his act of failing to register as a sex offender in 2008), and, as the majority grudgingly concedes, failure to register is non-violent, ante, at 236. Although “the purpose of failure-to-register laws is to protect society ... from sex offenders,” the majority fails to explain how this truism counsels in favor of forced medication. Every criminal proscription aims to protect society from criminals. And like the alleged credit card fraud and identity theft at issue in White, failure to register is a non-violent crime, the nature of which diminishes the government’s interest in prosecution. 620 F.3d at 419. This could hardly be more self-evident than with respect to an offender already on lifetime probation.
Also, the majority overstates the significance of Sanderson’s prior convictions for failure to register, concluding that “monitoring requirements imposed by SORNA and Virginia’s probation judgment do not help him.” Ante, at 236. In fact, the prior convictions indicate that monitoring works, insofar as the government has located Sanderson when he has failed to check in with his probation officer. The very purpose of SORNA is to track sex offenders and notify the public where they live. United States v. Under Seal, 709 F.3d 257, 265 (4th Cir.2013). As already mentioned, *240 to the extent that Sanderson’s failure to comply with monitoring requirements endangers public safety, the government has not shown that forcibly medicating him to stand trial would more effectively protect the public. In the first place, the government has shown no connection between Sanderson’s failure to register and his refusal to take antipsychotic medication. But even if such a connection exists, forcibly medicating Sanderson for competency purposes will not ensure that he continues the medication should he be convicted and sentenced. Indeed, as the record shows, Sanderson has stopped taking antipsychotic medication in the past, and the government conceded at oral argument that he could not be forced to continue taking the medication after conviction and sentencing unless he posed a danger to himself or others. See Washington v. Harper, 494 U.S. 210, 227, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (holding that the Due Process Clause permits the government “to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate’s medical interest”). The government’s own witness, Dr. Bryon Herbel, indicated that the government is unlikely to make this showing because Sanderson has exhibited no recent signs of “direct aggression,” “violence” or “harm” toward himself, “othersf,] or property of others.” J.A. 50.
Next, the majority mistakenly suggests that Sanderson “poses a public threat” that “weighs in favor of forcible medication.” Ante, at 236. In reaching this conclusion, the majority cites Sanderson’s “history of violent offenses,” including “assault with a deadly weapon” and “battery,” id., but overlooks details that diminish the apparent seriousness of these crimes. For instance, although Sanderson was convicted of assault with a deadly weapon in March 1991, he apparently was confined only a few months: seven months later, he was arrested for pedestrian soliciting rides or business. Similarly, Sanderson was convicted of battery in September 1994, but received only a 10-day sentence. Id. at 106. It is curious that the majority believes it is better positioned to gauge the seriousness of these past offenses than were the sentencing judges. In any event, Dr. Herbel testified that Sanderson’s recent history (the past 10 to 15 years) has been “relatively free of direct aggression or violence or overt criminal behavior aside from failure to register.” J.A. 50. Thus, contrary to the majority’s assertion, Sand-erson does not pose a public threat absent medication.
Nor is it certain that Sanderson will simply “go free” if we do not affirm the involuntary medication order. Ante, at 237. Although the government may elect to dismiss the charges, neither the government nor the majority has explained why continued detention, for a reasonable amount of time, would violate Sanderson’s due process, when forced medication would not.[1] Moreover, “[ejvery state provides *241 avenues” for civil commitment, Sell, 589 U.S. at 182, 123 S.Ct. 2174, and the record is devoid of any facts indicating whether Sanderson would qualify for such a program.[2]
It seems clear to me, as well, that the majority underestimates the time that Sanderson will have spent in detention before trial, and how much this diminishes the government’s interest in prosecuting him. The majority correctly notes that, by the day of oral argument, Sanderson had been detained about two years (24 months). Ante, at 237. His restoration to competency will take at least 12 to 14 weeks,[3] and Sanderson will be detained substantially longer if he wishes to exhaust his appellate rights. Sanderson is entitled to move for an en banc rehearing by this Court and to file a petition for certiorari to the Supreme Court, avenues that could prolong Sanderson’s detention at least six additional months.[4] Furthermore, the majority fails to consider the impact of good time credits, which may significantly lengthen the amount of time Sanderson will be deemed to have served, should he ultimately be convicted and sentenced to prison. Barber v. Thomas, 560 U.S. 474, 130 S.Ct. 2499, 2502, 177 L.Ed.2d 1 (2010) (“Federal sentencing law permits ... authorities to award prisoners credit against prison time as a reward for good behavior.”) (citing 18 U.S.C. § 3624(b)).
Assuming Sanderson exhausts his appellate rights in six months (increasing his detention to 30 months), and his restoration to competency takes 12 weeks (increasing his detention to 33 months), he will be entitled to about 146 days — or nearly five months — of good time credits, increasing his total (credited) detention to nearly 38 months. See Barber, 130 S.Ct. at 2502-03; White, 620 F.3d at 414 n. 13; 18 U.S.C. § 3624(b). This total, of course, does not include the months he will have remained in detention pending our decision in this appeal, and awaiting his trial and sentencing.[5] Adding those months to the total no doubt will bring Sanderson’s credited detention within his advisory guidelines sentencing range of 41 to 51 months.[6]
*242 I note, in addition, that the majority concedes that “the government will not be substantially burdened in proving the offense if the case is delayed.” Ante, at 238. Although the Sell Court expressly identified this as a special circumstance that diminishes the government’s interest in prosecution, Sell, 539 U.S. at 180, 123 S.Ct. 2174, the majority erroneously concludes that it counsels in favor of forced medication, because “the record suggests that Sanderson will not regain competence without medication.” Ante, at 238. The majority’s focus is misplaced. Whether Sanderson will improve without medication is a separate question from whether he will likely consent to medication. That he has refused so far does not mean that he may not consent in the future. And because Sanderson’s prosecution does not depend on witnesses whose “memories may fade” or on “evidence [that] may be lost,” Sell, 539 U.S. at 180, 123 S.Ct. 2174, the government has failed to show that immediate forced medication is preferable to continued detention for a reasonable period of time.[7]
Ill
In sum, the majority has failed to “ensure that this case is sufficiently exceptional to warrant the extraordinary measure of forcible medication.” White, 620 F.3d at 413. Sanderson is charged with a nonviolent crime; he poses no physical danger to society; forcibly medicating him to become competent for trial will not ensure his continued medication after adjudication, either during any period of further incarceration or after his certain release; the government will not be substantially burdened in proving the crime if the case is delayed; and Sanderson is unlikely to receive a sentence longer than the time he will have already served, should he be convicted. Such circumstances make clear that “little public good or benefit will be achieved” in forcibly medicating Sanderson to stand trial. White, 620 F.3d at 422.[8]
*243 We should reverse the order of the district court. Respectfully, I dissent.

. To be sure, the government could not indefinitely detain Sanderson. In Jackson v. Indiana, the Supreme Court held that
a person charged ... with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the [government] must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.
406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). Here, Dr. Herbel testi *241 fied that "antipsychotic medication” is "the standard treatment of people who suffer from schizophrenia," and Sanderson would probably remain incompetent without the drugs. J.A. 25-26, 48. But the record also indicates that Sanderson has consented at least once before to medication, and it is unclear whether Sanderson would be more likely, after some period of continued detention (during which his counsel could continue to advise him of his best options), to consent to antipsy-chotic medication.

. Dr. Herbel testified only that Sanderson would be a "weak candidate" for commitment under federal law. J.A. 50.

. See Dr. Herbel Test., J.A. 35-36 (noting that effective treatment takes "eight weeks ... at an adequate dose" of antipsychotic medication) (emphasis added), and id. at 59-60 (noting that "it may take a month or six weeks” to get to a therapeutic dose). Indeed, the government requested an order allowing treatment to last up to four months.

. Our en banc petitioning process would take a minimum of about 24 days. Fed. R.App. P. 40. Sanderson could file his petition for cer-tiorari anytime within 90 days of the final ruling by the Fourth Circuit, and if the Government wanted to file a brief in opposition, the process would take an additional 30 days. Sup. Ct. R. 13(1), 15(3). Thus, if the Supreme Court denied his petition in less than five weeks, Sanderson's legal remedies would be entirely exhausted in about six months.

. The majority asserts that "whether Sander-son will exhaust his appellate rights (and how long that will take) is entirely speculative." Ante, at p. 237 n. 3. But "just as counsel has vigorously pursued the appeal to this court on behalf of his mentally ill client, we would expect his vigorous representation to continue through further appellate review.” White, 620 F.3d at 414 n. 11.

. If Sanderson were to plead guilty after becoming competent (and it is impossible to believe he will not), his advisory guidelines sentencing range would be even lower: 30-37 months. See U.S. Sentencing Guidelines Manual § 2A3.5 (2013) (providing a base offense level of 16 for failure to register as a Tier III sex offender); id. at § 3E1.1 (allowing a three-level reduction in a defendant’s offense level for acceptance of responsibility); id. at Sentencing Table (providing for an advisory sentencing range of 30-37 months for a defendant with an offense level of 13 and criminal history category V). See also United States v. Grigsby, 712 F.3d 964, 973-74 (6th Cir.2013) (taking into account this three-level, acceptance-of-responsibility reduction when considering the propriety of forcibly medicating a pretrial detainee to become competent to stand trial).

. I do not dispute the majority’s conclusion that "the likely effectiveness of the prescribed medication on Sanderson’s illness supports the government's request” to forcibly medicate Sanderson. Ante, at 238. Sanderson conceded as much by not challenging the government’s proof of the second Sell factor, whether "involuntary medication will significantly further" the government’s interest in prosecution. Sell, 539 U.S. at 181, 123 S.Ct. 2174 (emphasis in original). Our focus, of course, is on the first Sell factor, and while the efficacy of antipsychotic medication may not diminish the government’s interest in prosecution, neither does it increase that interest.

.Without in any manner questioning the bona fides of the district court's order, the plain fact that any judge wants to move cases off his docket cannot go unremarked upon. In federal and state "Baby Judge Schools,” see, e.g., Steinebach v. Tucson Electric Power Co. (In re Steinebach), 303 B.R. 634, 640 (Bankr.D.Ariz.2004), and In re Conduct of Galler, 805 N.W.2d 240, 245 (Minn.2011), judges are routinely tutored to be mindful not to permit docket pressures to seep into decision-making. Sanderson’s case presents a paradigm challenge: if he's not medicated, *243 what is a beleaguered district judge to do? While I appreciate the challenge, we should hesitate to make forcible medication the default solution. Certainly, Sell does not countenance such an outcome. Nor is there any warrant for the Third Branch to act as the all-purpose problem-solver for systemic challenges traceable to both legislative efforts to over-federalize criminal law, see United States v. Bond, 681 F.3d 149, 169 (3d Cir.2012) (Rendell, J., concurring) ("Perhaps lured by the perception of easier convictions and tougher sentences, prosecutors opt to proceed federally. There is no law against this, or principle that we can call upon, to limit or regulate it.”) (internal citation omitted), cert. granted, - U.S. —, 133 S.Ct. 978, 184 L.Ed.2d 758 (2013), and to the sometimes dubious exercise of prosecutorial discretion to which those efforts give rise, see generally Daniel Richman, Prosecutors and Their Agents, Agents and Their Prosecutors, 103 Co-luro. L. Rev. 749, 795 (2003) ("[T]he federal criminal 'code' may well be even broader than that of the states in the range of conduct it ostensibly covers.”). See also Michael A. Simons, Prosecutorial Discretion and Prosecution Guidelines: A Case Study in Controlling Federalization, 75 N.Y.U. L. Rev. 893 (2000); Kathleen F. Brickey, Criminal Mischief: The Federalization of American Criminal Law, 46 Hastings L.J. 1135 (1995).